# EXHIBIT 1

1              IN THE UNITED STATES DISTRICT COURT

              FOR THE EASTERN DISTRICT OF TEXAS

2                     SHERMAN DIVISION

3   NADIYA WILLIAMS-BOLDWARE,      )

                                   )

4                  Plaintiff,      ) CIVIL ACTION

                                   )

5   VS.                            ) NO.:

                                   ) 4:17-CV-00859-ALM-KPJ

6   DENTON COUNTY, TEXAS,          )

                                   )

7                  Defendant.      )

8        ------------------------------------

9            ORAL AND VIDEOTAPED DEPOSITION OF

10               NADIYA WILLIAMS-BOLDWARE

11                   JUNE 19, 2018

12       ------------------------------------

13       ORAL AND VIDEOTAPED DEPOSITION OF NADIYA

14  WILLIAMS-BOLDWARE, produced as a witness at the instance

15  of the DEFENDANT, and duly sworn, was taken in the

16  above-styled and numbered cause on June 19, 2018, from

17  9:51 a.m. to 6:01 p.m., before Claudia White, CSR in and

18  for the State of Texas, reported by machine shorthand,

19  at the law offices of Chris Raesz, P.C., 306 North

20  Carroll Boulevard, Denton, Texas, pursuant to the

21  Federal Rules of Civil Procedure.

22

23

24

25  No. 2915194

                                              Page 1

1    A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4        Mr. Chris Raesz, Esq.
         CHRIS RAESZ, P.C.
5        306 North Carroll Boulevard
         Denton, Texas 76201
6        (940) 380-9505
         office@chrisraeszpc.com
7
8    FOR THE DEFENDANT:
9        Mr. Hunter Johnson, Esq.
         CONSTANGY, BROOKS, SMITH & PROPHETE, LLP
10       1201 Elm Street
         Suite 2550
11       Dallas, Texas 75270
         (214) 646-8625
12       hjohnson@constangy.com
13
     THE VIDEOGRAPHER:
14
         Mr. Brian Primavera, Videographer
15       VERITEXT LEGAL SOLUTIONS
         Veritext Registration No. 571
16       300 Throckmorton, Suite 1600
         Fort Worth, Texas 76102
17       (817) 336-3042
18
     ALSO PRESENT:
19
         Mr. Paul Johnson
20       Ms. Jamie Beck
21
22
23
24
25
                                          Page 2

for Ms. Boldware 6/25/10..............205
                                          4
1   Exhibit 21   Denton County Performance Evaluation
                 for Ms. Boldware 6/25/14................209
2   Exhibit 22   Email from J.Beck to District
                 Attorney 12/8/15.....................214
3   Exhibit 23   Email from J.Beck to District
                 Attorney 12/10/15...................222
4   Exhibit 24   Plaintiff's Response to Defendant's
                 First Set of Interrogatories.........222
5   Exhibit 25   Email from J.Beck to District
                 Attorney 12/22/15...................228
6   Exhibit 26   Email from J.Beck to District
                 Attorney 12/31/15 ....................231
7   Exhibit 27   Email from T.Powers to J.Beck
                 1/15/14..................................233
8   Exhibit 28   Email from K.Kidd to K.Lowe 2/12/14....236
    Exhibit 29   Email from M.Dickens to K.Kidd
9                10/13/15.....................240
    Exhibit 30   Email from J.Beck to District
10               Attorneys 11/2016....................252
    Exhibit 31   Email from J.Beck to District
11               Attorneys 11/2016....................252
    Exhibit 32   Online Application for Collin County
12               8/2009.............................277
    Exhibit 33   Job Application for Collin County
13               10/3/11........................277
    Exhibit 34   Job Application to Collin County
14               1/25/16........................277
    Exhibit 35   Job Application to Collin County
15               12/4/17.......................278
    Exhibit 36   Disclosure Responses of Ms. Boldware...282
16  Exhibit 37   Expert Disclosures....................299
    Exhibit 38   Denton County Salary History for
17               Paul Hiemke........................302
18
19               REQUESTED DOCUMENTS/INFORMATION
    NO.   DESCRIPTION                       PAGE
20
        NONE   .......................................
21
22               CERTIFIED QUESTIONS
23  NO.                            PAGE/LINE
24      NONE   ....................................
25
                                          Page 4

1            INDEX
                          PAGE
2   Appearances........................................... 2
3
4   NADIYA WILLIAMS-BOLDWARE
5       EXAMINATION BY MR. JOHNSON.................... 5
6   Changes and Signature...........................315
    Reporter's Certificate............................ 317
7
        .................................................
8
            EXHIBITS
9   Exhibit 1    Notice of Deposition.................. 9
    Exhibit 2    Plaintiff's Original Complaint......... 20
10  Exhibit 3    Testimony excerpted from transcript
                 from trial of Nadiya Williams........... 39
11  Exhibit 4    Texas Workforce Charge of
                 Discrimination.....................105
12  Exhibit 5    Interview Notes of Angel Padilla.......109
    Exhibit 6    Intake Questionnaire 7/2017............114
13  Exhibit 7    Fifth Circuit Opinion from prior
                 lawsuit...............................119
14  Exhibit 8    Denton County Salary History for
                 Nadiya Williams-Boldware..............138
15  Exhibit 9    Email from J.Beck to N.Boldware
                 7/2012..................................142
16  Exhibit 10   Court Assignment Schedule..........146
    Exhibit 11   Email to the Office 9/27/13..........152
17  Exhibit 12   Email from N.Boldware to J.Beck
                 7/17/14...........................159
18  Exhibit 13   Email from J.Beck to N.Boldware
                 7/16/14.............................159
19  Exhibit 14   Email from J.Beck to A.Sartin
                 7/16/14...........................168
20  Exhibit 15   Email from N.Boldware to J.Beck
                 6/30/14...........................169
21  Exhibit 16   Email from N.Boldware to J.Beck
                 1/25/16.............................173
22  Exhibit 17   Email from J.Beck to N.Boldware
                 1/29/16.............................174
23  Exhibit 18   Denton County Performance Evaluation
                 for Ms. Boldware 7/11/07............197
24  Exhibit 19   Denton County Performance Evaluation
                 for Ms. Boldware 6/30/08.............203
25  Exhibit 20   Denton County Employee Evaluation
                                          Page 3

1            THE VIDEOGRAPHER:  We are on the record at
2    9:55.  Today is June 19th, 2018.  This is the videotaped
3    deposition of Nadiya Boldware.  This is the beginning of
4    Tape 1, Volume 1.
5            Will Counsel please state their appearances
6    and any agreements for the record.
7            MR. JOHNSON:  Hunter Johnson for Defendant
8    Denton County.
9            MR. RAESZ:  Chris Raesz for the Plaintiff.
10           THE VIDEOGRAPHER:  Will the court reporter
11   please swear in the witness.
12           (Oath administered.)
13           THE REPORTER:  Will this be taken under the
14   Texas Rules of Civil Procedure?
15           MR. JOHNSON:  The Federal Rules of Civil
16   Procedure.
17           THE REPORTER:  Oh, I'm so sorry.  Yes,
18   thank you.
19           MR. JOHNSON:  Uh-huh.
20           NADIYA WILLIAMS-BOLDWARE,
21   having been first duly sworn, testified as follows:
22           DIRECT EXAMINATION
23   BY MR. JOHNSON:
24       Q.  Would you state your full name, please.
25           MR. RAESZ:  Do you want to swear her in
                                          Page 5

                                          2 (Pages 2 - 5)

**Page 26**

1    A. I am not.

2    Q. Have -- prior to, let's say, December of 2015,
3  have you ever gone to Paul Johnson specifically and
4  said, "Paul, I want a felony position"?

5    A. I have not.

6    Q. Prior to December of 2015, have you gone to
7  Paul Johnson and said, "Paul, I want a misdemeanor chief
8  position"?

9    A. I have not.

10    Q. Okay. Did I say misdemeanor chief correctly,
11  because is that what you're claiming that you should
12  have been promoted to in this case?

13    A. It is one of the opportunities that could have
14  been an option --

15    Q. Okay.

16    A. -- and never offered.

17    Q. And before -- let me digress for a second.

18        I'd like to know what job positions you
19  sought in general, not the specific.

20        So we have felony positions?

21    A. Yes, sir.

22    Q. We have misdemeanor chief or misdemeanor deputy
23  positions or -- you help me understand. Which ones of
24  those are you claiming you should have been given?

25    A. There -- I -- well, my first desire is

**Page 27**

1  definitely felony. There have been positions in our
2  division where the -- underneath the misdemeanor chief,
3  there's a felony [sic] chief position. Throughout the
4  course of my tenure in the office, I have never attained
5  a chief position, and that would be one of
6  consideration.

7    Q. Okay. I think you said felony. Did you mean
8  misdemeanor?

9    A. Misdemeanor.

10    Q. Underneath the misdemeanor chief, there's a
11  misdemeanor --

12    A. Yes, the deputy.

13    Q. Right. So you said felony. So what your
14  testimony is, is underneath the misdemeanor --

15    A. Misdemeanor.

16    Q. -- chief pos -- division chief position,
17  there's some deputy or chief positions, maybe like a
18  courtroom chief or something, and your contention is you
19  should have been promoted into those?

20    A. Yes, sir.

21    Q. Is that right? I just want to make sure I
22  understand what your claims are.

23    A. Yes, sir.

24    Q. Okay. So we've got felony -- I'm going to call
25  it misdemeanor chief; is that fair? I just want to make

**Page 28**

1  sure I'm using the right term. Okay. Is that right for
2  you? I want you to be comfortable with --

3    A. I think we're --

4    Q. -- this term, because --

5    A. I think we have a general understanding.

6  There's a little difference between the misdemeanor
7  chief and a deputy chief, because --

8    Q. Well, why don't you go ahead and explain that,
9  because I want to make sure we're -- we're all --

10    A. The --

11    Q. -- on the same page.

12    A. The misdemeanor chief is one that does the
13  dealy -- daily workings of one specific court with a set
14  of prosecutors.

15    Q. Uh-huh.

16    A. They consult that individual if there's an
17  issue with the plea or she's over -- he or she is
18  overseeing, like, trial -- you know, trial issues. They
19  could be the go-between if there's an issue in the court
20  or with the judge, and they need to go to their chief.

21  So that -- that one deals with the -- the daily
22  management of one specific court.

23        The deputy chief is almost -- I don't want
24  to say a hybrid, but it is a position where they're
25  dealing with supervising or dealing with misdemeanor

**Page 29**

1  issues, as well, but they've also been elevated to a
2  level -- level where they're dealing with felony --
3  felony DWIs and intake issues. So it's not just the
4  misdemeanor business of the division. It's a little bit
5  different.

6    Q. Okay. And so, I'm looking at a -- a court
7  assignment chart. I'm not going to use it as an exhibit
8  right now, but it says misdemeanor division. It says
9  division chief is Kristin Kidd. Is she the current
10  division chief?

11    A. Yes, she is.

12    Q. Okay. Are you contending you should have had
13  the division chief job that Kristin Kidd has?

14    A. No, that's nor.

15    Q. Now then, there's the deputy misdemeanor chief,
16  and that is Emily Chiliv --

17    A. Chilivetis. I don't know if I said it
18  correctly.

19        MR. RAESZ: Chilivetis.

20        MS. JAMIE BECK: Chilivetis.

21    Q. (BY MR. JOHNSON) Thank you. Chilivetis.
22  She's the current deputy misdemeanor chief?

23    A. Yes, she is.

24    Q. Are you contending in this lawsuit that you
25  should have had her job as deputy misdemeanor chief?

8 (Pages 26 - 29)

**Page 30**

1    A. I could.

2    Q. Okay. And then -- now, in this chart, we have

3  the chart's broken out by courts, right? And then, in

4  that, you have various levels of attorneys. You have --

5  yeah. So you start out with Misdemeanor II prosecutor,

6  right?

7    A. (Witness nods.)

8    Q. And then you go to Misdemeanor I prosecutor.

9  And then you're -- are you claiming there's a courtroom

10 chief then, too?

11   A. There are courtroom chiefs that have been

12 promoted, or you can see their transition in our

13 office --

14   Q. Uh-huh.

15   A. -- that seems to have worked a lot of -- a lot

16 faster and more fluid than any transition that I seem to

17 be able to accomplish in our office.

18   Q. Okay.

19   A. But I -- I will -- okay.

20        MR. JOHNSON: Objection, nonresponsive.

21   Q. (BY MR. JOHNSON) What I'm trying to understand

22 is this word chief is -- I'm seeing it now on two or

23 three different positions, and I want to make sure we're

24 all on the same page.

25        I have chief of court, is a term. Is that

**Page 31**

1  the Misdemeanor I felony prosecutor for a particular

2  court?

3    A. No. You said felony prosecutor -- Misdemeanor

4  I felony prosecutor. It's Misdemeanor I misdemeanor

5  prosecutor.

6    Q. Right. Thank you.

7        And then the chief of court would be who?

8    A. It would --

9    Q. Be the Misdemeanor I?

10   A. I -- I almost need to get a piece of paper so I

11 can map it out.

12        The Misdemeanor I in that court is usually

13 a chief, and then any subordinates would be a II.

14   Q. Okay. So let me just -- let's just go to Judge

15 Couch [sic].

16   A. Crouch.

17        MR. RAESZ: Crouch.

18   Q. (BY MR. JOHNSON) Sorry, I didn't see the C.

19 The light is not great in here.

20        The -- he's a County Court Criminal No. 1,

21 right?

22   A. Yes, sir.

23   Q. And Zach Watson is a Misdemeanor II prosecutor?

24   A. I would have to look at the --

25   Q. Okay.

**Page 32**

1    A. -- flowchart to know --

2    Q. All right.

3    A. -- exactly where they all --

4    Q. How about Ali Horton?

5    A. She's a -- she's a II.

6    Q. And then how about Barrett Doran?

7    A. He's a chief I believe now.

8    Q. He's a Misdemeanor I chief of court?

9    A. Yes.

10   Q. All right. All right. So now that I think

11 I've got all these -- there are a lot of chief hats,

12 aren't there?

13        So now that -- so you're contending that

14 you have never been a chief of court?

15   A. That's correct.

16   Q. And that's one of your claims in this lawsuit?

17   A. That's correct.

18   Q. Now, you have been a Misdemeanor I, haven't

19 you?

20   A. I am currently.

21   Q. You're currently a Misdemeanor I?

22   A. That's correct.

23   Q. Now, do you remember -- I want to go way back

24 to my question.

25        Have you ever applied, specifically sent an

**Page 33**

1  email to Jamie or Paul or Kristin that says, "Hey,

2  Jamie, Paul or Kristin, I want to be a deputy

3  misdemeanor chief or a chief of court"?

4    A. No, I have not.

5    Q. Have you responded to a job posting by Jamie

6  primarily, or from possibly someone else, Kristin or

7  Paul, that says, "Hey, we've got this chief opening,"

8  and you -- have you ever responded to it saying, "Yes,

9  I'm interested or want to be considered for either the

10 chief of court or the deputy misdemeanor chief"?

11   A. No, I have not.

12   Q. Let's go back to paragraph 18 of the complaint.

13 Now, I guess I'm trying to understand why you're

14 inserting this allegation in your complaint.

15        Are you trying to show that you put Paul on

16 notice that you wanted to be promoted to a felony

17 prosecutor at some point in your career? Is that why

18 you're putting paragraph 18 in the complaint?

19        MR. RAESZ: Object to the form.

20   Q. (BY MR. JOHNSON) Or, if you don't know, that's

21 fine. Just say "I don't know," but --

22   A. Well, will you repeat your question so I can --

23   Q. Well, do you know whether or not you need to

24 show whether you sought out a position to prove your

25 failure-to-promote case? Do you even know whether or

1  not you need to do that?
2    A.  I'm sorry, repeat your question.
3    Q.  Do you know whether or not you need to show
4  that you sought a position to prove your
5  failure-to-promote case?
6    A.  I know that I've sought many positions and were
7  declined for those positions.
8    Q.  And that's not my question, so I guess your
9  answer is, yes, I know that I need to seek the positions
10  out?
11    A.  Yes, I have.
12    Q.  No.  My question is, do you know whether or not
13  you need to show that you sought a position in order to
14  prove your case?
15    A.  Yes.
16    Q.  And we have certain emails that we've already
17  talked about.
18    Prior to December of 2015, what did you do
19  to seek out the positions that you're complaining you
20  did not obtain?
21    A.  Mo -- any -- I -- any position I've sought or
22  desired was primarily through the office notifying us
23  that this position was available, and I -- and then I
24  then responded by email.  So when I knew that a position
25  was available, I responded --

Page 34

1    Q.  Okay.  That's fair enough.
2    A.  -- via email.
3    Q.  So I -- I've seen emails starting in December
4  of 2015 coming forward.  I haven't seen any emails prior
5  to December of 2015.  And you've already testified
6  you're not aware of any, right?
7    A.  I -- I cannot think of any at this time, no.
8    Q.  Okay.  So is it fair for me to conclude that,
9  prior to December of 2015, you did not specifically seek
10  out any felony or misdemeanor -- chief misdemeanor
11  position?
12    MR. RAESZ:  Object to the form.
13    Q.  (BY MR. JOHNSON)  Since we have not seen any
14  emails -- or you're not aware of any emails?
15    MR. RAESZ:  Same objection.
16    A.  No, I'm not -- I'm not aware of any emails.
17    Q.  I want to repeat my question then.
18    Is it fair for me to conclude that, prior
19  to December of 2015, you did not specifically seek out
20  any felony or misdemeanor chief positions?
21    MR. RAESZ:  I'm going to object to the
22  form.
23    A.  As to July 2014 and when I took the demotion to
24  move to intake, the positions that I sought out were
25  noted by emails.  Since July 2014 to the present, the

Page 35

1  positions that I sought out were by email.
2    Q.  (BY MR. JOHNSON)  So is it fair --
3    So is it fair to assume that prior to July
4  of 2014, you did not seek out any felony or misdemeanor
5  chief positions with Denton County?
6    A.  I did not seek out any that I was notified of,
7  no.
8    Q.  And since July of 2014, when you transferred to
9  intake, again, your -- the way that you sought these
10  positions was via an email?
11    A.  Yes.
12    Q.  And so either there's going to be an email or
13  there's not, correct?
14    A.  That's correct.
15    Q.  Okay.  And if there's not an email, then --
16  well, as you sit here today, you've seen the emails.  In
17  fact, you just testified earlier you actually read
18  through them in preparation for your deposition,
19  correct?
20    A.  Yes.
21    Q.  Are you aware of any other emails that you sent
22  to Jamie that have not been produced in this lawsuit
23  regarding your efforts to seek a promotion?
24    A.  I am not.
25    Q.  Okay.  Again, I'm just trying to get an

Page 36

1  understanding of what's going on here.  Okay?  I'm not
2  trying to trick you.
3    So it's fair, then, that the emails that we
4  have and that have been produced, you've read, we're
5  going to go through them in a minute, are the ones where
6  you sought the positions that you're complaining about?
7    A.  That's fair.
8    Q.  Now, I want to go back to this testimony about,
9  "Ms. Boldware testified in the foregoing matter that it
10  was and remained her desire to be a felony prosecutor."
11    Do you remember what you actually testified
12  to at trial?
13    A.  Not word for word, no.
14    Q.  Okay.  I'm going to assume that somehow this
15  has been put in your complaint to try to satisfy your
16  burden of showing that -- that somehow you put Paul or
17  Denton County on notice that you were seeking a felony
18  position.  Okay?  Because that's the only reason I can
19  think of why it would be stuck in there, so -- okay?
20  Assume for me that's why that's pled.
21    Do you understand what I'm saying?
22    A.  I can't -- I --
23    Q.  Well, do you know why it's in there?  I guess
24  what other reason would this paragraph 18 be pled?
25    A.  Because it shows that as an employee of Denton,

Page 37

Nadiya Williams-Boldware - June 19, 2018

Job No. 2915194

| Page 38 |
|---|
| 1 I had and have -- curr -- I had and I currently have the |
| 2 intention of being a -- to moving forward.  I don't want |
| 3 to stay stale in a position for the -- the entire |
| 4 duration of my career in Denton County. |
| 5    Q.  I get -- I understand that. |
| 6    A.  That would not be -- I mean, why -- why -- why |
| 7 would I have gone to law school and done all that work |
| 8 if I wanted to just stay where you started -- |
| 9    Q.  Yeah, I get that -- |
| 10    A.  -- and not have the opportunity to grow, so -- |
| 11    Q.  Right.  Right.  There's various ways of doing |
| 12 that, too, right? |
| 13    A.  There are. |
| 14    Q.  Uh-huh. |
| 15        MR. JOHNSON:  Now, I'm want to go back and |
| 16 I'm going to object to the extent your answer wasn't |
| 17 responsive to my question. |
| 18    Q.  (BY MR. JOHNSON)  Do you remember what you |
| 19 testified to at trial -- |
| 20        MR. RAESZ:  Object to form. |
| 21    Q.  (BY MR. JOHNSON)  -- in relation to paragraph |
| 22 18? |
| 23        MR. RAESZ:  Object to the form. |
| 24    A.  I would not able to recite what I testified to, |
| 25 word for word -- |

Page 40

1 is -- you're on direct examination with your lawyer,
2 Mr. Raesz, and he's talking with you.  107, line 7, it
3 says, "We'll come back to the supervisor issue.  Right
4 now I'd like you to give the jury some idea of what the
5 normal progression is from a beginning misdemeanor
6 prosecutor to a felony position."
7        Did I read that correctly?
8    A.  Yes.
9    Q.  And then you start answering questions about
10 that, correct?
11    A.  Correct.
12    ==Q.  All right.  I'm going to skip ahead.  Let's go==
13 ==to page 108, and line 11.  Chris asked you, "And then,==
14 ==at some point, do you move from a lower misdemeanor==
15 ==prosecutor to the chief position in the misdemeanor==
16 ==court?"==
17        ==Okay.  Why don't you read your answer,==
18 ==starting at line 14.==
19    ==A.  "Yes, sir.  After people either have to leave==
20 ==and be transferred up the chain to felony court, do they==
21 ==go out on their own or do something different, but there==
22 ==is kind of a seniority type basis.  You look -- look to==
23 ==see who's been there the longest, and those people==
24 ==rotate through being assigned to chief of court."==
25    ==Q.  All right.  And then he says, "At some point,==

| Page 39 |
|---|
| 1    Q.  (BY MR. JOHNSON)  Okay. |
| 2    A.  -- regarding trial. |
| 3    Q.  All right.  Well, guess what I found.  I found |
| 4 your transcript. |
| 5        Do you remember when -- did you testify |
| 6 while your lawyer, Chris Raesz, was examining you? |
| 7    A.  I wouldn't be able to recall who did what in |
| 8 that -- who was examining or cross-examining me at that |
| 9 time. |
| 10    ==(Exhibit 3 marked.)== |
| 11    Q.  (BY MR. JOHNSON)  All right.  Now, I'm going to |
| 12 show you Deposition Exhibit No. 3.  All right.  Now, I'm |
| 13 also going to show you -- this is the -- a copy that I |
| 14 obtained of your transcript.  Page 1 shows the case |
| 15 style, civil action, Nadiya Williams. |
| 16        Does that look like the case trial on your |
| 17 first -- |
| 18    A.  That looks like it would be correct. |
| 19    Q.  Okay.  And I'll represent to you then, I have a |
| 20 bunch of pages of transcript.  And what I'm handing to |
| 21 you is -- is page -- I don't know, pages 106 to 109 of |
| 22 your trial transcript.  Okay? |
| 23    A.  Okay. |
| 24    Q.  If you would, go to -- so go to page 107.  And |
| 25 I'm -- what I'm reading this is -- it looks like Chris |

Page 41

1 ==it would require a vacancy for someone to move from==
2 ==misdemeanor to felony," correct?==
3    ==A.  Yes.==
4    ==Q.  You answered, "Yes, sir."==
5        ==And then it say -- he asks, "Now, when you==
6 ==took the job initially at Denton County District==
7 ==Attorney's Office, it was -- it -- your intention to==
8 ==move through that track from the lower misdemeanor up to==
9 ==felony?"==
10        ==And what did you answer?==
11    ==A.  "That was the career path that I had==
12 ==anticipated for myself, and that was the direction that==
13 ==I had planned on taking, yes."==
14    Q.  Okay.  Is that the testimony that you gave at
15 trial that you're referring to in paragraph 18 of your
16 complaint?
17    A.  It -- I believe it's the concept of, yes.
18    Q.  Okay.  And then, actually, go to page 109.
19 That's that.  And then go to page 109, line 12, and
20 answer that -- read that, your answer on that.  It says,
21 "I mean, that's definitely a lofty dream."
22    A.  "Lofty dream, but that -- I mean, that's the
23 direction that you -- you head on.  You come into
24 misdemeanor -- at least I did.  You go into misdemeanor.
25 I wanted the supervisors to provide supervisory

11 (Pages 38 - 41)

1 experience. I wanted to become a misdemeanor chief. I
2 wanted to matriculate. I wanted to progress up the
3 chain of advancement."
4    Q. All right. Do you believe that's also the
5 testimony that you gave in support of paragraph 18 of
6 your complaint?
7       MR. RAESZ: Object to the form.
8    A. It -- it shows the concept of, yes, why I felt
9 --
10    Q. (BY MR. JOHNSON) As you look back on your
11 testimony in that case, are you aware of anywhere else
12 you testified as to this desire to be a felony
13 prosecutor?
14    A. As I stated before, I can't recall every detail
15 of my testimony at that -- during the previous trial and
16 the current.
17    Q. I tell you what we'll do. I'm going to leave a
18 blank in the deposition, and if you want to go back and
19 review the transcript and supplement that, I'll give you
20 the opportunity to do so. Okay?
21    A. Thank you.
22    Q. Where you can show that you said -- expressed a
23 desire to be a felony prosecutor. Okay?
24    A. Yes, sir.
25    _____

Page 42

1    A. I can't speculate as to what Paul Johnson did
2 or did not know. I can just tell you that my position
3 was put out there.
4    Q. (BY MR. JOHNSON) Your position was put out
5 there at trial?
6    A. That --
7    Q. Right.
8    A. -- that was my -- my intention and my desire
9 was to become a felony prosecutor. You work your way
10 up.
11    Q. Okay. So you -- and -- and -- and -- and if we
12 were to go back and say how -- when did you put the
13 company on -- Denton on notice that you wanted to be a
14 felony prosecutor, you're going to say, well, it was
15 during trial, this one time, right?
16    A. I -- I believe it would be my position that
17 walking into an office and understanding that there is a
18 path to matriculate up the chain to the higher levels of
19 prosecution, I would hope that any prosecutor that came
20 into that office would have the same -- that dream, but
21 I know that it was definitely mine.
22    Q. Okay. I respect that. That was your -- and
23 that's fine, that was your dream. But the -- Denton
24 County doesn't -- is not -- doesn't have that structure.
25 There's no policy that says you shall start out as a

Page 44

1    _____
2    _____
3       MR. JOHNSON: All right. Would you do that
4 for me, Court Reporter?
5       THE REPORTER: Yes.
6       MR. JOHNSON: All right. Thank you.
7    Q. (BY MR. JOHNSON) Now -- now, I want to go back
8 to your complaint. In paragraph 18, it says you
9 testified in the foregoing that it was and remained your
10 desire to be a felony prosecutor, right?
11    A. Yes.
12    Q. I don't see the word remained in those
13 paragraphs we just read. In fact, the way I read them,
14 it all looks past tense. It's what I wanted to do, it
15 was, it was, it was, right?
16    A. Well --
17    Q. Let me ask you, was the word "remained" in any
18 of those sections we just reviewed in your trial
19 testimony?
20    A. No, sir.
21    Q. And, again, are you trying to show -- by
22 paragraph 18, are you trying to contend that somehow
23 Paul Johnson left that trial knowing that you wanted to
24 be a felony prosecutor?
25       MR. RAESZ: Object to the form.

Page 43

1 misdemeanor and then work your way to a felony, right?
2 There's no written policy on that?
3    A. No, but I do believe that they do want to
4 encompass an ability for minorities to work their way up
5 and to find positions where they can have leader -- or
6 experiences such as a chief or a leadership ability. I
7 believe that in their -- their own company policies,
8 they state that they look for -- they look at what the
9 population of Denton County is, whether or not they're
10 Indian or Asian or black, and they want those
11 individuals to slowly advance or matriculate in their
12 system. So I think that's a Denton County -- something
13 that Denton seeks as a gold -- goal.
14       MR. JOHNSON: I object to the answer after
15 the word no, move to strike.
16    Q. (BY MR. JOHNSON) My question is, you're not
17 aware of a written practice of Denton County that --
18 that says -- or policy that you -- if you start out as a
19 misdemeanor, you will end up as a felony prosecutor, a
20 written policy, are you?
21    A. I am not aware of a written policy.
22    Q. Okay. So as far as evidence of your seeking a
23 position as a felony prosecutor, we have this trial
24 testimony that we've covered, correct?
25    A. Yes.

Page 45

12 (Pages 42 - 45)

**Page 46**

1 Q. All right. And then -- and then we have some
2 emails --
3 A. (Witness nods.)
4 Q. -- that you sent.
5 So when you testified at trial, and
6 assuming this testimony that we've identified is the
7 only time you talked about this desire, do you know
8 whether Paul Johnson was even in the courtroom at that
9 particular time?
10 A. I am not certain.
11 Q. Okay. Now -- well, he -- you know, you know
12 about the rule for excluding witnesses, correct? You
13 probably do that all the time --
14 A. Yes.
15 Q. -- in your practice, right?
16 Do you know that Paul was sitting in the
17 hallway when you testified?
18 A. No, I did not.
19 Q. Okay. You didn't see him in the -- well, you
20 didn't see him in the courtroom, right?
21 A. It wasn't --
22 Q. And he's sitting right here, right?
23 A. Yes.
24 Q. And you're familiar with who he is. So you
25 just don't remember whether or not he was even in the

**Page 47**

1 courtroom when you made this --
2 A. No, I do not.
3 Q. -- testimony? Okay.
4 Because I believe later on in the
5 complaint, you're -- you make some allegations that
6 somehow he's known all the time. But to the extent
7 you're making that allegation, that he's known all the
8 time of your desire, that's really just your opinion,
9 correct?
10 A. No, that's not correct.
11 Q. Okay. Well, let's turn to paragraph 29.
12 A. Paragraph --
13 Q. Paragraph 29, last sentence. Read it, please.
14 A. "At all times, Paul Johnson was aware of the
15 claims made by Plaintiff in her prior lawsuit and her
16 desire to be a felony prosecutor."
17 Q. Okay. What evidence do you have to support
18 that allegation?
19 A. That my position -- I have continued to seek
20 positions of higher -- higher levels of employment in
21 the office that entire time that we've -- the emails
22 that you've pointed out cover spans of time during --
23 previously mentioned.
24 Q. Okay. We're going to get to all those emails.
25 A. Okay.

**Page 48**

1 Q. And we -- I think we've already established
2 that those emails started in December of 2015.
3 MR. RAESZ: Object to the form.
4 Q. (BY MR. JOHNSON) The only reason -- and,
5 again, you read through them the other day. I mean, is
6 there -- am I wrong in saying that they're around 20 --
7 December of 2015?
8 A. That sounds right.
9 Q. Okay. So -- let me get off-track here.
10 So other than those emails, what evidence
11 do you have that Paul Johnson was aware of the claims
12 made by Plaintiff in her prior lawsuit and her desire to
13 be a felony prosecutor? That's really the key. What
14 other evidence do you have that -- to support her
15 allegation that, at all times, Paul Johnson was aware of
16 your desire to be a felony prosecutor?
17 A. When I interviewed with Paul, I told him then
18 and there I wanted to be the best prosecutor possible,
19 the best lawyer possible. So I think I came into that
20 office knowing and believing that -- I showed him the
21 same letter that I carried with me since I was a child,
22 and told him from the very point I was interviewed.
23 I -- I showed him that same letter in my interview that
24 day --
25 Q. Okay.

**Page 49**

1 A. -- of wanting to the best lawyer possible from
2 the -- from the start of this.
3 Q. All right. And that's commendable. But you
4 didn't use the word felony in that interview or in your
5 letter, did you?
6 A. No, I didn't.
7 Q. And you didn't use the word misdemeanor chief
8 in your letter or in your interview with -- with Paul,
9 did you?
10 A. No, I did not.
11 Q. All right. What other evidence do you have
12 that, at all times, Paul Johnson was aware of your
13 desire to be a felony prosecutor, other than the emails
14 that we're going to cover, this trial testimony, and
15 what you just testified about regarding your interview
16 and your letter?
17 A. Nothing that I can think of at this point.
18 Q. Now, you admit that when you interviewed with
19 Paul, that was in February of 2007?
20 A. Yes.
21 Q. That was 11 years ago?
22 A. Uh-huh.
23 Q. There's a lot that's happened between 2007 and
24 -- and June of 2018, right?
25 A. Yes.

Nadiya Williams-Boldware - June 19, 2018

Job No. 2915194

| | |
|---|---|
| 1    A. Yes. | 1  because I exercised my right to sue from the prior |
| 2    Q. And then Sections 1981 and 1983 of the Civil | 2  lawsuit. |
| 3  Rights Act. I'm not sure -- so we've covered you're | 3    Q. Right. Treated differently in terms of |
| 4  suing for race discrimination. | 4  promotions? |
| 5        Are you also suing for color? Because I | 5    A. Yes. |
| 6  didn't see it in your EEOC charge. Are you sure about | 6    Q. I haven't seen anything else, so I just want to |
| 7  -- I just want to make sure you're sure about that. Are | 7  make sure. |
| 8  you suing for color discrimination, or do you know? | 8    A. Yes. |
| 9        A. That I'm African-American or black? Yes. | 9    Q. Is that fair? |
| 10   Q. Well, color is your skin color. | 10   A. Yes. |
| 11   A. Black, yes. | 11   Q. Okay. Now -- so then as far as the protected |
| 12   Q. Okay. And then -- now, I haven't seen | 12 activity, closed quote, that you engaged in that gave |
| 13 anything -- there's no harassment. I'm not sure if that | 13 rise to your retaliation claim, it's the prior lawsuit? |
| 14 was a typo. There's not harassment. It's a failure to | 14   A. Yes. |
| 15 promote, right? | 15   Q. Is there anything -- other protected activity |
| 16   A. Failure to promote. | 16 that you claim you engaged in that they're retaliating |
| 17   Q. Okay. No harassment? | 17 against you? |
| 18   A. No. | 18   A. No. |
| 19   Q. Okay. And then you're -- also on page 8 you're | 19   Q. Okay. And as far as the positions that you |
| 20 suing for retaliation and discrimination under state | 20 claim you were unlawfully denied, I got off -- we have |
| 21 law, correct? | 21 felony, we have misdemeanor chief, correct? |
| 22   A. Correct. | 22   A. Yes. |
| 23   Q. And then on page 9 you're suing for retaliation | 23   Q. And then there's this civil position that you |
| 24 and discrimination under federal law; is that right? | 24 applied for. Are you now claiming that you were |
| 25   A. Yes. | 25 unlawfully denied a civil position? |
| Page 102 | Page 104 |

| | |
|---|---|
| 1    Q. Now, I think I got off track. I wanted to -- | 1    A. I -- I went out, interviewed, and I -- they |
| 2  so if I can just summarize that you're suing for Title | 2  decided to pursue someone else. |
| 3  VII discrimination for failure to promote under federal | 3    Q. Uh-huh. So we have felony, civil, and |
| 4  law and then under the Texas Labor Code; is that | 4  misdemeanor chief. Are there any other positions within |
| 5  correct? Discrimination under federal and state law for | 5  Denton County that you claim you should have been |
| 6  failing to promote you? I'm not trying to trick you, | 6  promoted into other than felony, civil, and misdemeanor |
| 7  I'm just trying to -- | 7  chief? |
| 8    A. Yes, sir, I'm just trying to make sure that I | 8    A. No. |
| 9  -- | 9    Q. And we've already covered, you never applied |
| 10   Q. Look up -- just look up at me. | 10 for a misdemeanor chief position -- specifically applied |
| 11   A. I'm -- | 11 for a misdemeanor chief position? |
| 12   Q. You're suing for discrimination under state and | 12   A. No, I did not. |
| 13 federal law because you're contending in this case that | 13       (Exhibit 4 marked.) |
| 14 Denton County has not promoted you? | 14   Q. (BY MR. JOHNSON)  Let me show you what's been |
| 15   A. Yes, sir. | 15 marked as Deposition Exhibit 4. Can you identify that? |
| 16   Q. Right? | 16   A. Texas Workforce Charge of Discrimination. |
| 17       Okay. And the second claim is that you're | 17   Q. Uh-huh. Is this your charge of discrimination |
| 18 claiming they retaliated against you by not promoting | 18 that you filed in this lawsuit? |
| 19 you? | 19   A. Yes. |
| 20   A. Retaliation as -- retaliation in regards to | 20   Q. Is it a true and correct copy of the charge? |
| 21 because I was part of or the subject of the prior | 21   A. Yes. |
| 22 lawsuit -- | 22   Q. Is that your signature at the bottom left-hand |
| 23   Q. Uh-huh. | 23 corner? Is that a copy of your signature? |
| 24   A. -- I am, therefore, treated differently as a | 24   A. Yes. |
| 25 subject to be picked out or looked upon differently | 25   Q. And is it dated -- you signed this charge on |
| Page 103 | Page 105 |

27 (Pages 102 - 105)

1 July 3rd of 2017?
2     A.  Yes.
3     Q.  And does --
4         MR. RAESZ:  Is this the complete document?
5         MR. JOHNSON:  It's the complete charge, as
6 far as I can tell.
7         MR. RAESZ:  Because there was a narrative
8 that was --
9         MR. JOHNSON:  Object to the sidebar.  But
10 if you want to go off the record for a second.
11        MR. RAESZ:  No, I'm just -- there was a
12 narrative --
13        MR. JOHNSON:  Do you want to go off?
14        THE VIDEOGRAPHER:  Off the record at 12:09.
15        (Break taken from 12:09 p.m. to 12:10 p.m.)
16        THE VIDEOGRAPHER:  Back on the record at
17 12:10.
18    Q.  (BY MR. JOHNSON)  All right.  So let's go -- I
19 want to review Exhibit 4, your -- your EEOC charge.
20        So in the discrimination based on -- see
21 those boxes that are checked?
22    A.  Yes.
23    Q.  Do you see you checked race, correct?
24    A.  Yes.
25    Q.  You checked retaliation?

Page 106

1 position that I applied for."
2     Q.  Okay.  All right.  And do you believe that
3 accurately summarizes your charge of discrimination?
4     A.  It's a summary, yes.
5     Q.  Okay.  You don't believe -- is it accurate?
6     A.  No, because I've already seen errors.
7     Q.  What are the errors?
8     A.  The summary that was attached to this has an
9 error as -- as recorded by Angel Padilla.
10    Q.  All right.  Okay.  What else?  What other
11 errors?
12    A.  And the dates of discrimination took place
13 January -- or January 3rd, 2017, through the latest of
14 1/3/2017.
15    Q.  Well, how does that need to be corrected?
16    A.  Because it needs to stretch further back into
17 the re -- the dates of application.
18    Q.  What would that be?
19    A.  The -- I would have to look back on the emails
20 submitted in --
21    Q.  Well, I think we --
22    A.  -- discovery.
23    Q.  -- we talked about that they were around
24 December of 2015, correct?
25    A.  Yeah.

Page 108

1     A.  Yes.
2     Q.  You did not check color, did you?
3     A.  No.
4     Q.  Okay.  And then go to the next box, dates
5 discrimination took place.  And what did you write?  The
6 earliest date was what?  Read that out.
7     A.  On or about September 2016.
8     Q.  No.  Go over -- you're in the wrong box.
9     A.  Okay.
10    Q.  Up here, in the box up here, the dates
11 discrimination took place, right here.
12    A.  January 3rd, 2017.
13    Q.  Uh-huh.  That's the earliest date that you
14 claim, in that box, that discrimination occurred, right?
15    A.  Yes.
16    Q.  All right.  And the latest date that you claim
17 discrimination took place was January 3rd, 2017,
18 correct?
19    A.  Yes.
20    Q.  All right.  So let's go down now, the
21 particulars.  And -- yeah, you can read that.  It says
22 -- go ahead and read the on or about.
23    A.  "On or about September 2016, I applied for
24 multiple positions for assistant district attorney
25 office.  On or about January 3rd, 2017, I was denied any

Page 107

1     Q.  Okay.  But not before then?
2     A.  That's correct.
3         MR. JOHNSON:  Okay.  That was 4?
4         (Exhibit 5 marked.)
5     Q.  (BY MR. JOHNSON)  Deposition Exhibit 5.  Now,
6 is this the interview notes that you just referred to
7 where Angel Padilla interviewed you?
8     A.  Yes.
9     Q.  Okay.  Now, let's -- let's just kind of recap.
10 So you went to the EEOC in June of 2017?
11    A.  Yes.
12    Q.  And you did not file a charge of discrimination
13 in June of 2017, did you?
14    A.  June of 20 --
15    Q.  Your July -- your charge is July.
16    A.  July, yes.
17    Q.  Right.  You were interviewed by Angel?
18    A.  Yes.
19    Q.  You decided at that point that you didn't want
20 to file a charge of discrimination --
21    A.  I --
22    Q.  -- correct?
23    A.  I asked -- he told me that I had an opportunity
24 to think about it.
25    Q.  Uh-huh.  And you said, I'm going to think about

Page 109

28 (Pages 106 - 109)

**Page 110**

1 it?
2    A.  Yes.
3    Q.  And then you came back in July and filed the
4 charge that is Exhibit 4?
5    A.  Yes.
6    Q.  Uh-huh.  Now, you have not filed any other
7 charges of discrimination against Denton County since
8 that July filing, have you?
9    A.  When --
10    Q.  I'm talking about filing, not -- have you filed
11 any charges of discrimination against the county since
12 July of 2017?
13    A.  July --
14    Q.  Yes or no?
15    A.  No.
16    Q.  Okay.  Let's go back to Exhibit 5.  Now, this
17 already -- these are the interview -- are these the
18 interview notes where you sat down with -- is Angel a --
19 he's a male?
20    A.  Yes.
21    Q.  Okay.  Mr. Padilla, these are his notes of his
22 interview of you; is that correct?
23    A.  Yes.
24    Q.  All right.  Where are the errors in these
25 interview notes?

**Page 111**

1    A.  Can I --
2    Q.  I mean, I can tell you one in March -- it says
3 March 4 you returned to work from leave, but --
4    A.  Yeah.
5    Q.  -- that's not true, because you returned in
6 September or October of '13, right?  I'll give you that
7 one.
8    A.  I -- a line that I don't understand how it's in
9 there is, "PCP said that her supervisor wanted to move
10 her to Child Protective Services and she asked to stay
11 in her current position."
12        I -- I don't know how or what, in all
13 honesty, that means.
14    Q.  All right.  So you don't -- all right.  That
15 may not be accurate; is that --
16    A.  Yeah.  I don't --
17    Q.  Okay.  What else?
18    A.  "The PCP said that her competence was
19 questioned by the judge in her first trial after
20 returning to work."
21    Q.  What -- what about that?
22    A.  Because it wasn't the -- it was the judge
23 asking Allison who's going to cover a hearing, and it
24 was Allison who, I believe, questioned.  I felt she
25 overlooked the fact that I was her second chair, as

**Page 112**

1 explained in our prior -- previous question about Alice
2 -- Allison.
3    Q.  Well, hold on.  So is it your testimony -- so
4 the judge -- you -- you said you -- that it -- what it
5 reads is, "PCP said that her competence was questioned
6 by the judge in her first trial after returning to
7 work."
8    A.  I felt -- no, it wasn't --
9    Q.  Did the judge --
10    A.  -- the judge.
11    Q.  -- question your competence, yes or no?
12    A.  No.
13    Q.  If -- and it was -- if she did, it wasn't to
14 you?
15    A.  It wasn't to me.
16    Q.  Okay.  Well, how did you do in that trial?
17    A.  According to my supervisors, good.
18    Q.  What exactly did Allison say?
19    A.  You did a good job.
20    Q.  Okay.  And it's your testimony here today that
21 the judge did not question your competence at trial?
22        MR. RAESZ:  Object to the form.
23    A.  I -- I'm sorry, I lost part of your question in
24 the objection.
25    Q.  (BY MR. JOHNSON)  It's your testimony today

**Page 113**

1 that the judge -- that you do not believe the judge
2 questioned your competence?
3        MR. RAESZ:  Object to the form.
4    A.  Not to my knowledge.
5    Q.  (BY MR. JOHNSON)  Okay.  All right.  So what
6 else are you -- do you, as you read through this --
7    A.  The -- in saying that I applied on January 3rd,
8 the -- the application or the notifying of the office
9 that I wanted to become that attorney actually happened
10 before January 3rd.  It was January 3rd which the -- the
11 position became official, who was going to be assigned.
12 So any application or notification that I was interested
13 would have occurred before.
14    Q.  Yeah.  Okay.  So that's when you found out that
15 Rachel Nichols had been --
16    A.  Yes, that's when it --
17    Q.  -- given a felony position that you're
18 complaining about in this case?
19    A.  Yes.
20    Q.  All right.
21    A.  Okay.
22    Q.  Have you pointed out all the instances where
23 you believe that those interview notes are incorrect?
24 Can you clarify?
25    A.  Yes.

29 (Pages 110 - 113)

Page 114

1    Q.  So you -- you -- well, her [sic] notes that say
2  you applied for three positions to become a felony chief
3  is accurate?  PCP said that she was -- has applied for
4  at least three -- three positions to become a felony
5  chief?
6    A.  Three felony positions.
7    Q.  Uh-huh.  All right.  So, again, I don't see
8  anything about a civil position in here.  So at least
9  you're not complaining to the EEOC Investigator Padilla
10  about not being given a civil position, are you?
11    A.  I provided documentation to him of all the
12  positions I applied for, and that should have been
13  included in the documentation I provided to him when I
14  visited.
15    Q.  Okay.  Should that be in the EEOC file then?
16    A.  Yes.
17       (Exhibit 6 marked.)
18    Q.  (BY MR. JOHNSON)  Let me show you Deposition
19  Exhibit No. 6.  This looks like an -- an intake
20  questionnaire you filled out in July of 2017.  Is that
21  true?
22    A.  Yes.
23    Q.  And is this your handwriting?
24    A.  Yes.
25    Q.  And is that your signature on the last page?

Page 115

1    A.  Yes.
2    Q.  Actually, it looks like you filled this out in
3  June of 2017; is that right?
4    A.  Yes.
5    Q.  And this is a true and correct copy of your --
6    A.  Yes.
7    Q.  So turn to page 2.  Item 4, there are boxes
8  that you can check?
9    A.  Yes.
10    Q.  Okay.  You checked race?
11    A.  Yes.
12    Q.  You checked retaliation?
13    A.  Yes.
14    Q.  You did not check color?
15    A.  That's correct.
16    Q.  And it says even after that, typically a
17  difference in skin -- skin shade within the same race?
18    A.  Where are we looking, I'm sorry?
19    Q.  Okay.  Then go to 5A.  It says, What happened
20  to you that you believe was discriminatory?
21       And you said, The date was January 3rd of
22  2017, and the action was failure to promote, correct?
23    A.  Yes.
24    Q.  And you said Paul Johnson was the person
25  responsible?

Page 116

1    A.  Yes.
2    Q.  And then 6, it says, Why do you believe these
3  actions were discriminatory?
4       And you said, It is my belief that the
5  failure to advance in the Denton County DA office after
6  10 years is based on my race and previous litigation; is
7  that correct?
8    A.  Yes.
9    Q.  And then it says, What reasons were given?  And
10  you said none?
11    A.  Correct.
12    Q.  So -- and you didn't know then and you don't
13  know now why -- what the reasons were for promotions
14  that you're complaining about in this case, do you?
15    A.  No.
16    Q.  And if you don't know what the reasons are, you
17  don't know if they're legitimate or not, do you?
18    A.  I stated --
19       MR. RAESZ:  Object to the form.
20    Q.  (BY MR. JOHNSON)  I'm sorry?
21    A.  I stated there are no reason -- no known
22  reasons.
23    Q.  (BY MR. JOHNSON)  And if you don't know what
24  the reasons are, you don't know if they're true or false
25  reason then, do you?

Page 117

1       MR. RAESZ:  Object to form.
2    A.  I don't know what the reasons are.
3    Q.  (BY MR. JOHNSON)  Right.  So you don't know if
4  they're true or false then, do you?
5       MR. RAESZ:  Object to the form.
6    A.  I don't know what the reasons are.
7    Q.  (BY MR. JOHNSON)  Okay.  My answer [sic] is yes
8  or no.  You don't know, then, if the reasons are true or
9  false, do you?  Yes or no.
10    A.  I do not know if the answers are true or false.
11    Q.  Okay.  Let's go to number 8.  Describe who was
12  similarly situated as you, right?  And then you have
13  like -- if you go to 8, then you have some blanks to
14  fill in, and you identified Paul Hiemke --
15    A.  Uh-huh.
16    Q.  -- is that right?
17       And Rachel Nichols?
18    A.  Yes.
19    Q.  Okay.  And those are the only two people you
20  identified in your EEOC charge as being similarly
21  situated, that were better treated; is that correct?
22    A.  Yes.
23    Q.  And as far as the -- all right.
24       So you didn't list Linda Puckett in this
25  intake questionnaire, did you?

30 (Pages 114 - 117)

1   Q.  (BY MR. JOHNSON)  Why would he hire you knowing
2   your race and skin color just to not promote you?
3       MR. RAESZ:  Object to the form.
4   Q.  (BY MR. JOHNSON)  Do you have an explanation
5   for that?
6   A.  I -- I don't know the interworkings of his
7   mind.
8   Q.  Okay.  It doesn't make sense, does it?  It
9   doesn't to me.  I'm just curious if --
10  A.  If -- well, racism doesn't make sense, so I
11  don't know the interworkings of his mind.
12  Q.  Well, if he was a racist, why would he approve
13  your hiring in the first place?  That's my point.
14      MR. RAESZ:  Object to the form.
15  Q.  (BY MR. JOHNSON)  Are you claiming that Paul is
16  a racist?
17  A.  I don't know the interworkings of his mind.
18  Q.  He has never once said anything negative about
19  your skin color, has he?
20  A.  Not to my face.
21  Q.  To your knowledge?
22      Well, has he said it to anybody else?
23  A.  I don't -- wouldn't know.
24  Q.  All right.  You don't have any evidence that
25  he's ever said anything about your race to anybody?

Page 134

1   A.  That wasn't the question.
2   Q.  (BY MR. JOHNSON)  Well, I know.  I'm trying to
3   find -- oh, he was retaliate -- that shows that he was
4   retaliating against you because of your lawsuit?
5   A.  No.  It shows that he identified with them.  If
6   he's apologizing --
7   Q.  Okay.
8   A.  -- for having to fire them, maybe he identified
9   with them or their activity or -- I don't know why he
10  would apologize.
11  Q.  Okay.  But that's just your guess as to why he
12  was apologizing, true?
13      MR. RAESZ:  Object to the form.
14  A.  I would not know.
15  Q.  (BY MR. JOHNSON)  But it very well could have
16  been because they're four people who have given their
17  life to the county that he's having to fire, right?
18  That could have been another reason?
19      MR. RAESZ:  Object to the form.
20  A.  I would not know.
21  Q.  (BY MR. JOHNSON)  For claims that you brought
22  that were ultimately not unlawful?
23      MR. RAESZ:  Object to the form.
24  Q.  (BY MR. JOHNSON)  So you started with Denton
25  County on February 28th of 2007, didn't you?

Page 136

1   A.  I would not know that.
2   Q.  Certainly hasn't said it to your face, has he?
3   A.  No, he has not.
4   Q.  And so you have no proof of that?
5   A.  No, I do not.
6   Q.  All right.  Do you have any proof that Paul has
7   ever said anything negative to you about your prior
8   lawsuit that you lost?
9       A.  I believe while he was firing the Piel --
10  -- the individuals involved in the last, that he
11  apologized to them for having to do so.  I don't know if
12  it's true or not.
13  Q.  They had worked for him for years, right?
14  A.  And so did I.
15  Q.  Do you think he had --
16  A.  So -- so did I.
17  Q.  -- so he's like, fire, you bastard, you know.
18  And, in fact, he probably -- according to the Fifth
19  Circuit, he didn't need to fire them?
20      MR. RAESZ:  Object to the form.
21  A.  Well, then he's not a good decisionmaker?
22  Q.  (BY MR. JOHNSON)  So you're saying because he
23  said, Hey, I'm sorry, but I'm going to have to fire you
24  that shows that he's a racist?
25      MR. RAESZ:  Object to the form.

Page 135

1   A.  Yes.
2   Q.  I'm want to ask you about a few people.  Sherry
3   Wolf, she's been your supervisor?
4   A.  Yes.
5   Q.  And did she supervise you at -- was she your
6   supervisor at CPS?
7   A.  Uh, yes.
8   Q.  And over you?
9   A.  Yes.
10  Q.  And she's now a supervisor over you at intake?
11  A.  Correct.
12  Q.  All right.  Is one of the reasons you moved to
13  intake because she had moved over there?
14  A.  I -- I continued in CPS even after she moved.
15  The position became available later, and I took it.
16  Q.  But you liked working for her?
17  A.  She's -- she's -- yeah, she's fine.
18  Q.  You'd rather work for her than Karin?
19  A.  Sure.
20  Q.  And was Sherry involved in your prior lawsuit
21  you lost, to your knowledge?
22  A.  Not -- not to my knowledge.  I can't think of
23  her involvement.
24  Q.  Has she ever said anything negative about your
25  race, color or prior lawsuit?

Page 137

35 (Pages 134 - 137)

1 on their bench, right?  And Mr. Stewart -- Judge Stewart
2 was there?
3     A.  Yes, all.
4     Q.  Huh?
5     A.  All the justices were there, yes.
6     Q.  All right.  And he's African-American?
7     A.  Yes.
8     Q.  And he wrote this opinion that you're upset
9 with?
10     A.  Okay.
11         MR. RAESZ:  Object to the form.
12     Q.  (BY MR. JOHNSON)  So you were pretty
13 well invest -- I mean, not only you tried the case, I
14 mean, you had won -- the jury gave you $500,000, right?
15     A.  Sure.  Yes.
16     Q.  Uh-huh.  But then the court took a chunk of
17 that away, correct?
18     A.  Okay.
19     Q.  And then the Fifth Circuit took the rest of it
20 away?
21     A.  Okay.
22     Q.  That's part of why you were disappointed?
23     A.  No.  The money doesn't matter to me.
24     Q.  Okay.  That's what you're telling this jury,
25 money doesn't matter to you?

Page 158

1         MR. RAESZ:  Object to form.
2     Q.  (BY MR. JOHNSON)  Are you asking for money in
3 this case?
4     A.  The money is part of the process.
5     Q.  Uh-huh.
6     A.  But righting a wrong is what I'm after and what
7 I want to pursue.
8     Q.  Okay.
9     A.  And have continued to pursue.
10     Q.  All right.  Is money important to you in this
11 case or not?
12     A.  It's not my primary focus, no.
13         (Exhibit 12 marked.)
14     Q.  (BY MR. JOHNSON)  Let me show you Exhibit 12.
15 And I want to talk a bit about your move to intake in
16 July of 2014 --
17     A.  Yes.
18     Q.  -- okay?
19         So -- actually, that's not the one I want
20 to start out with.  So just bear with me.  That's 12.
21         (Exhibit 13 marked.)
22     Q.  (BY MR. JOHNSON)  Okay.  Let's start with 13.
23 Let me show you 13 first.  All right.  So look that
24 over, would you, please.
25         Is Exhibit 13 a true and correct copy of an

Page 159

1 email exchange between -- well, first of all, Jamie Beck
2 and the district attorneys, and then between you and
3 Jamie Beck?
4     A.  Yes.
5     Q.  From July 15, 2014, through July 16, 2014
6 regarding the intake position?
7     A.  Yes.
8     Q.  So let's start at the bottom, so -- which is
9 the last page.  Jamie writes -- so, again, Jamie -- so
10 you don't dispute that it's typical for Jamie to post an
11 opening to the entire district attorney's office?
12     A.  That the way I've seen it happen.
13     Q.  That's the way -- and that's the way it happens
14 most of the time?
15     A.  To my knowledge, yes.
16     Q.  Okay.  You don't have any reason to disbelieve
17 that?
18     A.  This is the way I see openings happen, yes.
19     Q.  All right.  So -- and in this instance, on
20 July 15, 2014, Jamie sends out a notice that Sheila
21 Bowles is leaving.  And then it says, "We now have
22 another opening in the intake division."
23     A.  Okay.
24     Q.  Okay.  And so the normal process is for Jamie
25 to post an opening and then people to respond to that

Page 160

1 opening; is that true?
2     A.  Yes.
3     Q.  And so -- and in this instance -- instance,
4 excuse me, that same day, it looks like, actually four
5 minutes after she sent the email, you write -- that's
6 the next email from you to Jamie.  It's 1:28 p.m.  "Good
7 afternoon, I'm interested."
8     A.  Yes.
9     Q.  And then the next morning, she gets back to
10 you -- actually, she doesn't -- yeah, no.  She gets back
11 to you that day, says, "Hey, I just want you to know
12 it's a lower pay grade.  Are you still interested?"
13 Correct?
14     A.  Yeah.
15     Q.  Meaning you were going to make less money
16 taking this job?
17     A.  Yes.
18     Q.  Okay.  And then you respond, "Good morning.  I
19 know the difference.  I'm not certain at this time what
20 it would be.  I may have been under -- unclear about
21 movement in the past."
22         What did you mean by that, "unclear about
23 movement in the past"?  You weren't --
24     A.  Well, there had been another prosecutor that
25 had, like, moved around.  She was in the -- in juvenile,

Page 161

41 (Pages 158 - 161)

1 and the money that was with her kind of followed her to
2 where she went, so however that was assigned.
3      Q.  Okay.  I didn't understand your response,
4 but -- "At this -- but the pay cut may be worth my piece
5 of mind," right?
6      A.  Yes.
7      Q.  And then she says absolutely.  And then we go
8 on.  Going on to the first page now, you write Jamie and
9 Paul.  It looks like you now have got Paul in the loop.
10 Basically talking about the pay cut --
11      A.  Uh-huh.
12      Q.  -- right?
13           And it says, "Thanks.  I will look for Kim,
14 because I'm eager to get the information."
15           That's -- you're getting the information on
16 how much your wages were going to be cut, right?
17      A.  Yes.
18      Q.  Then it says, "I would think they are not
19 pleased with me, as my evaluation was lower than years'
20 past.  I don't want their perception of my courtroom
21 abilities to jeopardize the safety of Denton County
22 children."
23           So apparently this was Allison and Karin?
24      A.  They're in charge of the CPS division.
25      Q.  All right.  Who -- who was there?  Who was the

Page 162

1 --
2      A.  They are.
3      Q.  Who is -- who are the people you're referring
4 to in that second sentence, "I don't want their"?
5      A.  It would be Allison and -- Allison and Karin.
6      Q.  Okay.  So they had concerns about your
7 courtroom abilities?
8      A.  I saw a difference in my evaluation.
9      Q.  Uh-huh.
10      A.  And it had been different than in years past.
11 So that's what I was --
12      Q.  I don't think they evaluated you that -- that
13 time, but -- do you remember who evaluated you?
14      A.  It was Karin.
15      Q.  It was?
16      A.  Her name was on the top of that evaluation.
17      Q.  All right.
18      A.  Well, it says Sherry at this point, but then
19 when you go over to this -- the subcategories on the
20 evaluation, it's Karin.
21      Q.  It says Karin's eval -- so do you --
22      A.  Karin --
23      Q.  -- know who filled in the evaluation?
24      A.  It looks -- the way the format is set up, you
25 would think that it was Karin.

Page 163

1      Q.  Well, how do you -- do you know who actually
2 filled out that evaluation?
3      A.  I would believe that it's Karin.
4      Q.  Okay.
5      A.  That's who told me to turn it in.
6      Q.  You don't know who filled in out then, do you?
7 You don't have personal knowledge?  Because I read it,
8 and it looks like Sherry filled it out.
9      A.  I read it, and it looks like Karin filled it
10 out.
11      Q.  Okay.  But you don't know who filled it out, do
12 you?
13      A.  I approached the subject as if Karin had filled
14 it out and that was her evaluation.
15      Q.  Sorry, that's not my question.
16           My question is, you don't have personal
17 knowledge of who filled out what portion of that
18 evaluation, do you?
19      A.  That is correct.
20      Q.  I don't want their perception of -- so what
21 issues were they having with your courtroom abilities in
22 July of 2014?
23      A.  I had none -- none to note, but it was obvious
24 -- they -- to me it was as if something that I did or
25 did not do did not satisfy them or did not meet the

Page 164

1 standards, and that's what was -- what I'd imagine be
2 reflected in my evaluation.
3      Q.  Okay.  What other facts do you have to color
4 that statement, "Well, I don't want their perception of
5 their [sic] courtroom abilities"?  Any?
6      A.  I don't want their perception of my courtroom
7 abilities?
8      Q.  Yeah.  Apparently it's not a good perception,
9 right?
10      A.  Not if I got a lower evaluation, no.
11      Q.  Uh-huh.  But I don't want their perception of
12 my courtroom to jeopardize the safety of Denton County.
13           What did you mean by the safety of the
14 Denton County --
15      A.  Because --
16      Q.  -- children?
17      A.  -- I work in a division that deals with
18 children and how we place them and what we do with them.
19 And if they -- if their opinion was not highly -- if
20 they didn't -- weren't favorable, if it wasn't
21 favorable, then --
22      Q.  Right.
23      A.  -- I didn't want -- because I take my job,
24 like, personally.  I don't want to do anything adverse
25 to the client that I represent.  And if my supervisor's

Page 165

42 (Pages 162 - 165)

1 have you?

2    A. I mean, no, not -- no.

3    Q. And the last case you tried was in February

4 of 2014, correct?  And that was the Skidmore trial?

5    A. Yes, sir.

6    Q. And that was the only case you tried prior to

7 going on maternity leave in March of 2013, correct?

8    A. That was after maternity leave.  That trial I

9 tried with Allison after returning.

10    Q. Yeah.

11    A. Am I -- did you --

12    Q. No, I'm saying you didn't -- I take it you

13 didn't try any cases in 2013?

14    A. I -- I know the weekend -- the weekend that I

15 was going to give birth, I was preparing for a trial.  I

16 don't remember how many trials I had tried between

17 January and March of that year, so I couldn't speak for

18 certain.  But I was in the midst of preparing for a

19 trial that actual -- I guess it would have been the

20 following Monday or whatever it was, and had to send my

21 stuff to Karin because I went into labor.

22    Q. Okay.  So the last time you may have tried a

23 case was prior to March of 2013, right?

24    A. Yes.

25    Q. Well, other than the Skidmore trial, right?

Page 178

---

1    A. Yes.

2    Q. And the Skidmore trial was four years and four

3 months ago, correct?

4    A. Sounds --

5    Q. 2014, June of '18; is that right?

6    A. That sounds -- an approximation.

7    Q. Okay.  If you haven't tried a case in four --

8 four years, I guess I'm kind of scratching my head.  Do

9 you -- how do you think you can just jump back in and

10 start trying felony cases?

11        MR. RAESZ:  Object to the form.

12    Q. (BY MR. JOHNSON)  I mean, do you work out at

13 all?  I mean, do you -- do you run or anything?

14        MR. RAESZ:  Object to the form.

15    A. I have a treadmill and I walk on a treadmill.

16    Q. (BY MR. JOHNSON)  Okay.  So let's say you

17 decide, I'm going to run a marathon, right?

18    A. Sure.

19    Q. Okay.  Do you just show up one day and run the

20 marathon?

21    A. No.

22    Q. What do you do?

23    A. You practice.

24    Q. Right.  Practice, practice, practice?

25    A. Yes.

Page 179

---

1    Q. And are you -- but I'm -- I guess I'm trying to

2 figure this out.  You're suing, saying I should be a

3 felony prosecutor as of today, right?

4        MR. RAESZ:  Object to the form.

5    Q. (BY MR. JOHNSON)  Correct?

6    A. I am saying that I was denied the opportunity

7 to become a felony prosecutor.

8    Q. Well, you're -- but you're sitting here today

9 saying, I'm ready to go, right?  I'm ready to -- I can

10 try a case tomorrow.  If Paul says give you a felony

11 trial tomorrow, you're ready to go?

12    A. Yes.

13    Q. You are?  Having not tried a case in four

14 years?

15    A. I'd open up my book and get to work.

16    Q. Okay.  All right.  I want to talk about the

17 importance of felony prosecution.  Those are -- they're

18 big cases, right?

19    A. Yes, they are.

20    Q. Very high profile.  They're murders, correct?

21    A. Yes, sir.

22    Q. They're rapes?

23    A. Yes, sir.

24    Q. Serious assaults?

25    A. Yes.

Page 180

---

1    Q. They're cases where the victims and family have

2 suffered greatly?

3    A. Yes, sir.

4    Q. And you understand there are no do-overs,

5 right?

6    A. That is correct.

7    Q. And if you screw up at trial and that guy walks

8 free, or gal -- I don't want to be sexist -- that's it,

9 they're free.  So a murderer can go free; is that right?

10    A. Yes, sir.

11    Q. If you screw it up, right?

12    A. I understand that.

13    Q. All right.  And you agree that Denton County

14 has a responsibility to place the most qualified person

15 in that prosecution chair in the felony court?

16    A. I understand.

17    Q. Right?  You agree with that?

18    A. Yes.

19    Q. And they should not do so just because of

20 someone's race or skin color, right?

21    A. They should not deny the person the opportunity

22 when they --

23    Q. That's not my question.

24    A. -- are invested --

25    Q. You're -- you're not telling this jury that

Page 181

46 (Pages 178 - 181)

Page 182

1 Denton County has an obligation to promote someone to a
2 felony position just because of their race or skin
3 color, are you?
4    A. No.  I'm saying I was denied the opportunity.
5        MR. JOHNSON: Object as nonresponsive after
6 no.
7    Q. (BY MR. JOHNSON)  And they should not put
8 someone in a felony position just because of the number
9 of years they've worked there, should they?
10       MR. RAESZ:  Object to the form.
11   A. Well, that would lead to my -- the -- speaking
12 about my experience and my being trained prior to the
13 felony position.  The number of years that I had
14 invested and worked in trial, and whether it be
15 misdemeanor or CPS, the training would have occurred in
16 those years.
17   Q. (BY MR. JOHNSON)  You're not aware of any
18 policy that says we promote based on tenure, are you?
19   A. No, I am not.
20   Q. And you're not aware of any practice that
21 Denton County promotes based on tenure, are you?
22   A. I am not.
23   Q. Okay.  Because that would be foolish.  Just
24 because someone's --
25       MR. RAESZ:  Object to form.

Page 183

1    Q. (BY MR. JOHNSON)  -- been there 10 years
2 doesn't mean they're the most qualified for the job,
3 does it?
4    A. It could.
5    Q. That's not my question.  Just because someone's
6 been somewhere for 10 years doesn't mean they're the
7 most qualified for the job, does it?
8    A. It could.
9    Q. It -- it could, but it also couldn't, right?
10   A. It could.
11   Q. All right.  You're going to stick with that.
12       How do you know that tenure played a factor
13 in any of the promotions that you're complaining about?
14   A. Because you can calculate when a person's start
15 date was and how long that they've been there, and you
16 can map it out.  Which I was able to look at so-and-so
17 started here, they've been here this long, and watch how
18 many years individuals had been there compared to me.
19   Q. So is it your contention that one of the
20 reasons that -- that -- that you claim that they should
21 have picked you over them is because you were there
22 longer, because of your tenure?
23   A. It appeared that they were going on the next
24 senior individual, and the next senior, excluding me,
25 was often promoted.

Page 184

1    Q. What do you mean it appeared that they were
2 going on the next senior?  What do you mean?
3    A. Well, just looking at the range of when people
4 started and their tenure in the office, looking at some
5 of that, most of the ones that I definitely started with
6 have progressed up the chain and become felony or
7 similar positions.  And you're watching -- even the
8 misdemeanor, if you calculate their date and start date,
9 who's matriculating to different types of positions,
10 whether or not it's Mr. -- you know, I or II or the
11 misdemeanor chief.  So you -- some of that pattern, you
12 just -- they didn't put like a Misdemeanor II into a
13 chief position.  They -- people had been there longer
14 and had the trial experience, and it looks as if they
15 followed that sort of chain.
16   Q. Now, no one told you that information that you
17 just testified to, right?  Paul didn't tell you that,
18 right?
19   A. No.
20   Q. Jamie didn't tell you that, right?
21   A. No.
22   Q. Michael Moore didn't tell you that?
23   A. No.
24   Q. Okay.  Now, that's just your conclusion based
25 upon the documents you've looked at and what you just

Page 185

1 testified about, right?
2    A. That's my observation.
3    Q. Okay.  Your observation.
4        And you have no -- you didn't sit in on any
5 of the promotion meetings, did you?
6    A. I did not.
7    Q. And you don't know if tenure had a factor --
8 played a role or not?
9    A. I do not.
10   Q. What do you think it takes to be a felony
11 prosecutor?
12   A. It -- it takes someone that will get into the
13 courtroom and -- well, before you even get into the
14 courtroom, deal with the ins and out of a case that
15 intake has decided to have indicted, making sure that
16 the elements that the intake division initially saw are
17 satisfied by the evidence that the trial attorney now
18 has, and whether or not that evidence will hold up or if
19 it's going to be kicked out.  So the -- having the
20 ability to get in and argue for that evidence and
21 protect that evidence so your case can proceed, and then
22 being able to coordinate all of the witnesses, evidence,
23 and information collected from that process to proceed
24 to trial or plea or how -- however else the case will be
25 resolved.

47 (Pages 182 - 185)

1 notes too closely?
2   A.  I -- I don't know.  I don't know if it does.
3   Q.  Has anyone ever been critical of your trial
4 skills, to your knowledge?
5   A.  I think in all -- I mean, I think in any --
6 especially earlier on in misdemeanor, we would sit down
7 and you would talk about what did or did not go right in
8 your trials.  And that you would -- could happen with
9 your chief, Michael -- not Michael.  Michael Graves or
10 Sean Kilgore or -- I mean, whoever else had been my
11 chief back -- back then.  But it was a part of the
12 process of making sure that you -- you would grow from
13 whatever issue that they observe or whatever they
14 thought that you could do better.
15        So I don't have any specific incident, but
16 I know that it -- I mean, it happened while I was in the
17 trial division, that you'd sit down, and this is what
18 happened in the trial, this went right, this didn't,
19 let's do this differently, oh, that fell apart on us,
20 that witness -- you know, those are the things that
21 happened and you wanted to do better -- better the next
22 go-round.
23   Q.  Okay.  I just want to follow up.  You -- you do
24 agree that confidence is a material part of being a
25 successful felony prosecutor?
                                                    Page 190

1   Q.  Did you ever have to go to the hospital --
2 taken to the hospital by an ambulance because of the
3 stress and anxiety associated with getting ready for
4 trial?
5   A.  No.  I got sick because I had vert -- vertigo.
6   Q.  Uh-huh.
7   A.  Vert -- verti -- what -- yeah, vertigo --
8   Q.  Yeah.
9   A.  -- and got sick.
10   Q.  Where was that?  At work one day?
11   A.  Yes.
12   Q.  And when was that?
13   A.  Oh, that's been years.
14   Q.  Okay.
15   A.  I don't know an exact date, but it's been
16 years.
17   Q.  All right.  So years ago you had vertigo, and
18 you left work in an ambulance?
19   A.  I -- I was -- yeah.  I don't remember exactly
20 how I got there, but I know we went to an -- the Denton
21 -- is it Denton Regional or Denton somewhere --
22   Q.  Uh-huh.
23   A.  -- because I got sick.
24   Q.  Well, that's pretty serious if you're going in
25 an ambulance.  I mean, it's not like -- I mean, I drive
                                                    Page 192

1        MR. RAESZ:  Object to the form.
2   Q.  (BY MR. JOHNSON)  Being confident in front of a
3 jury?
4   A.  Yes, being persuasive.
5   Q.  Uh-huh.  And being confident?
6   A.  Yes.
7   Q.  And it's your testimony you've never struggled
8 at trial?
9        MR. RAESZ:  Object to form.
10   Q.  (BY MR. JOHNSON)  With confidence?
11        MR. RAESZ:  Object to the form.
12   A.  I don't recall ever --
13   Q.  (BY MR. JOHNSON)  How about nerves?
14   A.  -- not being confident.
15   Q.  Nerves?
16   A.  Oh, you walk into a trial and you want it to go
17 right and well and know that things can fall apart on
18 you on the day of trial.  Your witnesses don't show up,
19 an officer doesn't show up, and you know that that's
20 going to jeopardize, that -- that can -- that can rattle
21 you, but you have to keep on going and figure out how to
22 fill in the gap.
23   Q.  Okay.  Have you ever had a panic attack getting
24 ready for a trial?
25   A.  No.
                                                    Page 191

1 a car to the doctor if I'm sick.
2        MR. RAESZ:  Object to the form.
3   Q.  (BY MR. JOHNSON)  Right?
4   A.  I -- if they would have let me get in the car,
5 I would have done that.  It was whatever was happening
6 on the scene by whoever was making those decisions.
7   Q.  (BY MR. JOHNSON)  Okay.  Who was there with
8 you?
9   A.  I don't recall.  I mean, I -- I would believe
10 -- that was so long ago, that Susan may have been my
11 supervisor back then.
12   Q.  Uh-huh.  Okay.  And so you left work in an
13 ambulance.  Were you preparing for a trial?
14   A.  I don't recall.
15   Q.  All right.  Well, I've heard rumor that you had
16 a -- you were -- it was as a result of the stress and
17 anxiety of getting ready for trial, you had to leave in
18 an ambulance.  Is that true or not?
19   A.  That is not true.
20   Q.  You're claiming it's because you had vertigo?
21        What was the formal diagnosis at the end of
22 the day; do you remember?
23   A.  That, vertigo.
24   Q.  Vertigo?
25   A.  Yeah.
                                                    Page 193

49 (Pages 190 - 193)

1   Q.  Okay.  What caused it?
2   A.  I don't know all the -- I had ears examined and
3   stuff like that.  That may -- I don't know --
4   Q.  Oh, so --
5   A.  -- all the medical, yeah.
6   Q.  -- you were kind of weaving around, Oh, my
7   gosh.  Okay.  But you have no idea whether or not it was
8   caused by stress and anxiety?
9       MR. RAESZ:  Object to form.
10  A.  I don't know all the particulars behind --
11  Q.  (BY MR. JOHNSON)  And the hospital you went to
12  is Denton Regional?
13  A.  I -- I -- it was a Denton hospital.
14  Q.  Where was it?
15  A.  Off the highway, so --
16  Q.  Off 35?
17  A.  Yeah.
18  Q.  Okay.  So -- and that would have been sometime
19  since 2007?
20  A.  Before 2000 -- yeah, between 2007 and now.
21  Q.  All right.  And if -- do you remember any
22  doctors' names?
23  A.  No.
24  Q.  So if I wanted to go get the records from --
25  those medical records, I would go to Denton Regional

Page 194

---

1   Hospital off of 35?
2       MR. RAESZ:  Object to the form.
3   A.  I -- really, I don't know which hospital it
4   was, sir.  I don't --
5   Q.  (BY MR. JOHNSON)  Well, you said --
6   A.  I just know it was Denton --
7   Q.  -- Denton Regional?  I mean --
8   A.  Yeah, but I -- I don't want to mislead you.  It
9   was a Denton hospital that we went to.  If there's more
10  than one, but --
11  Q.  Well, how many times do you go to -- I don't
12  know.  You -- I know you've had a baby and, yes, I've
13  had a child, too, but, I mean, not a child, but I've
14  been with that.
15      But how many times have you been to the
16  hospital in an ambulance?
17  A.  I got sick once when -- after Anderson was
18  born.
19  Q.  And you went in an ambulance?
20  A.  Yes.
21  Q.  All right.  So you've been to a hospital twice
22  in an ambulance?
23  A.  Yes.  From my recollection, yeah.
24  Q.  Okay.  I don't know, it just seemed to me that
25  would remember the name of the hospital that you went to

Page 195

---

1   the first time you went in an ambulance.
2       MR. RAESZ:  Object to the form.
3   Q.  (BY MR. JOHNSON)  But, as you sit here, you're
4   going to say I don't remember!
5       MR. RAESZ:  Object to the form.
6   A.  It was a Denton hospital, sir.
7   Q.  (BY MR. JOHNSON)  Which cross street was it at?
8   A.  I do not know.
9   Q.  And you think Susan Piel would have knowledge
10  of -- of this incident?
11  A.  I think that it happened so early on in my
12  career, that she would have been my supervisor.  I don't
13  recall anyone else being -- being my supervisor at that
14  time.
15  Q.  Uh-huh.
16  A.  I don't think I started moving to Michael
17  Moore, or whomever else would have supervised me during
18  that range.
19  Q.  All right.  So are you telling this jury that
20  you've never had confidence issues in trial?
21      MR. RAESZ:  Object to the form.
22  A.  I think --
23  Q.  (BY MR. JOHNSON)  -- over the course of your
24  career?
25  A.  I think day one, when you started out as a

Page 196

---

1   prosecutor, we all work on our confidence and skills and
2   ability to become better trial attorneys.  And the more
3   you practice, the more confident you can feel.  But you
4   have to have an ounce of confidence before you even show
5   up to the game.
6   Q.  (BY MR. JOHNSON)  Okay.  Yes or no?  I have had
7   confidence issues at trial, yes or no?
8   A.  No.
9       MR. RAESZ:  Object to the form.
10  Q.  (BY MR. JOHNSON)  No?  That's your testimony
11  under oath?
12      MR. RAESZ:  Object to the form.
13  Q.  (BY MR. JOHNSON)  Right?
14  A.  Yes.
15  Q.  Who is Sean Kilgore?
16  A.  He is a former prosecutor.  He's a practicing
17  attorney now.
18  Q.  Was he a supervisor of yours?
19  A.  Yeah, when I first started out in Denton.
20      (Exhibit 18 marked.)
21  Q.  (BY MR. JOHNSON)  Let me show you Exhibit 18.
22  Okay.  So this -- is this a true and correct copy of an
23  evaluation report for you dated July 11th of 20 -- 2007?
24  A.  Yes.
25  Q.  Okay.  Now, did you and Sean get along okay?

Page 197

---

50 (Pages 194 - 197)

**Page 238**

1 take it you were never voted MVP at any time while you
2 were in the trial section, were you?
3         MR. RAESZ:  Object to the form.
4     A.  I'm not -- I don't even know -- didn't know
5 what the concept was.
6     Q.  (BY MR. JOHNSON)  Okay.  And, as a result, you
7 were never voted MVP, to your knowledge, were you?
8     A.  Not during my tenure.
9     Q.  Uh-huh.
10     A.  I don't know.
11     Q.  "I wanted to let you know that you had several
12 votes for MVP and that you received high praise from
13 your coworkers.  Here's a sampling of what they had to
14 say.  A good sounding board for trial strategy, managed
15 Court 3 without a chief for almost three months.  I keep
16 hearing Judge Garcia sing their praises about how well
17 the Court was run in the absence of a chief.  Next,
18 she's very detailed and learns quickly and is not afraid
19 to ask questions.  Next, I like this one, part of the,
20 quote, dream team."
21         MR. RAESZ:  Object to form.
22     Q.  (BY MR. JOHNSON)  That's in reference to OJ
23 Simpson's defense team.  That's the first time I ever
24 heard that term.  Isn't it for you?  Dream team?
25         MR. RAESZ:  Object to form.

**Page 239**

1     Q.  (BY MR. JOHNSON)  You don't know?  All right.
2         Okay.  So, long and the short of it,
3 Kathryn Lowe was given -- I mean, Kristin Kidd is giving
4 Kathryn Lowe a pretty high praise in February of 2014,
5 correct?
6     A.  Okay.
7     Q.  Is that fair?
8         Do you know who Michael Dickens is?
9     A.  Yes.
10     Q.  Who's he?
11     A.  He's a felony prosecutor in our office.
12     Q.  Where does he -- is he in the -- I'm sorry.
13 He's a felony prosecutor?
14     A.  He's been at CAC and felony.  I'd have to look
15 at -- he's no longer --
16     Q.  Was he in felony in 2015?
17     A.  I -- I'd have to look back at the -- most
18 likely, because he was there for a long time, and then
19 moved and changed positions, but I'd have to look at our
20 office flowchart for --
21     Q.  When you say looking at office flowchart,
22 you're talking about looking at a --
23     A.  A list of prosecutors that we update
24 occasionally when moves are made, so you know where --
25 who's where in the division.

**Page 240**

1     Q.  Is it your recollection that Michael Dickens
2 was in felony in October of 2015?
3     A.  I imagine he was.  I'm -- I haven't followed
4 where exactly he's been assigned, sir.
5     Q.  All right.
6         (Exhibit 29 marked.)
7     Q.  (BY MR. JOHNSON)  So let me show you
8 Exhibit 29.  Now, this is a document you produced,
9 right?  See that Boldware at the bottom?  That's your
10 Bates number?
11     A.  Yes.
12     Q.  Okay.  And Michael Dickens, who's a felony
13 prosecutor, is writing Kristin Kidd.  And she's the
14 misdemeanor chief, right?
15     A.  Yes.
16     Q.  And I'll just read it.  It's about Kathryn
17 Lowe.  "Kathryn did a great job defending against a
18 strong objection regarding the blood draw in the trial
19 just a few minutes ago.  She thought fast on her feet,
20 made a strong oral argument to the Court, and did a good
21 job of getting some case law together in a fast manner."
22         Did I read that accurately?
23     A.  Yes.
24     Q.  There's nothing in that email about lack of
25 confidence, is there?

**Page 241**

1         MR. RAESZ:  Object to the form.
2     A.  No.
3     Q.  (BY MR. JOHNSON)  Okay.  Do you believe you
4 were better qualified for the felony position than
5 Kathryn Lowe?
6     A.  I believe I'm qualified for the felony
7 position.
8     Q.  Okay.  Now, that's not my question, though.  As
9 between you and Kathryn Lowe, do you believe that you
10 were better qualified for her for the Felony II
11 position?
12         MR. RAESZ:  Object to the form.
13     A.  I believe that I'm qualified for the felony
14 position.
15     Q.  (BY MR. JOHNSON)  Okay.  So you can't state
16 whether you were better qualified or not?
17     A.  I know that I've received positive reviews, and
18 I believe that I'm qualified for the felony position.
19     Q.  Okay.  I'm going to give you one more chance.
20 Do you believe --
21         MR. RAESZ:  Object to form.
22     Q.  (BY MR. JOHNSON)  -- you were better qualified
23 or Kathryn Lowe for the Felony II position that was
24 given to her in December of 2015?
25     A.  Yes, I'm better qualified.

61 (Pages 238 - 241)

1    Q.  Why?
2       A.  Because I've also been a strong advocate in
3    oral argument, as evidenced by my evaluations given.
4    One of the last evaluations that I had before Karin was
5    by Sherry, in which she talks about I've led -- I was
6    the lead in that case and how -- how well I led in that
7    case.  It was in front of Judge Burgess, I believe, so
8    it would have been in the 158th.  And that was before I
9    went out on maternity leave.  So I've received positive
10   reviews, as well, from my supervisors in regards to my
11   trial abilities, and was actually the lead on that --
12   one of the last ones that I oversaw before going out on
13   maternity leave.
14      Q.  Okay.  That was all in 2013?
15      A.  Twenty thir -- well, that evaluation period --
16   yeah.
17      Q.  Okay.  And are these just your opinion as to
18   why you think you're better qualified than she is?
19      A.  I -- I received positive reviews, and based on
20   those positive reviews and my ability to work and adapt
21   and learn, I believe I'm better qualified.
22      Q.  Okay.  Now, she also has received positive
23   reviews, correct?
24      A.  Yes, she has.
25      Q.  So why are yours better than hers?

Page 242

1       A.  I received equal --
2       Q.  Okay.
3       A.  -- or at least accommodations [sic] of being a
4    good trial prosecutor, as evidenced by my evaluation,
5    which you can look at in regards to Sherry's evaluation,
6    my trial ability right before this.
7       Q.  Is it your testimony then you're -- you're
8    equal with her?
9       A.  I just -- I -- I believe I can compete and
10   could compete with her.
11      Q.  So are you equal?
12      A.  I believe that I can compete.
13      Q.  With her?
14      A.  Given the opportunity, yes.
15      Q.  Okay.  And on that basis, because you -- and
16   just to recap.  Because you received some positive
17   performance reviews in the past?
18      A.  I have.
19      Q.  Okay.  And what else did you say?
20      A.  And when they talk about having the ability
21   to -- and strong oral arguments, I've done just the
22   same.
23      Q.  Okay.
24      A.  Strong oral arguments and persuaded juries to
25   terminate.  And in my last trial, I did -- it did lead

Page 243

1    to termination.  Although the judge overturned it, and
2    our office didn't pursue anything further, but I did get
3    a termination right before I went out -- or in one of my
4    last trials before all of the other transpired.
5       Q.  Back in 2013?
6       A.  In that range.
7       Q.  All right.  And in 2014, again, the only case,
8    you put on one witness at the Skidmore trial, and that
9    was all your --
10          MR. RAESZ:  Object to form.
11      Q.  (BY MR. JOHNSON)  -- all you did with regard to
12   saying or -- anything in the courtroom?
13      A.  I'm sorry, I lost part of the your answer [sic]
14   in --
15      Q.  No, that's fine.
16      A.  Question, I mean.
17      Q.  Strike that question.
18          Okay.  Are there any other reasons why you
19   think you were better qualified or as qualified as
20   Kathryn Lowe?
21      A.  I have a strong work -- work ethic.  I have
22   managed to maintain a level -- or a professional
23   working -- professional working relationship with my
24   peers, despite the chaos that has happened in previous
25   litigation or even the current.  I've -- in having a

Page 244

1    strong work ethic, if they -- if she put something in
2    front of me, whether or not it was Sherry or Karin or
3    any other supervisor, I know that -- and I have shown
4    that I'd get -- get in and dig in and do the work to get
5    it done.
6       Q.  Okay.  Do you think that --
7       A.  I didn't shy -- I have -- don't shy away from
8    work.
9       Q.  Right.  Do you think Kathryn has a strong work
10   ethic?
11          MR. RAESZ:  Object to the form.
12      A.  I wouldn't know.
13      Q.  (BY MR. JOHNSON)  You don't know?
14          And, again, you've never seen her in the
15   courtroom, so you don't know -- you can't -- yourself,
16   you can't compare your trial skills to her trial skills,
17   can you?
18      A.  I have not seen her in the courtroom, no.
19      Q.  All right.  Are there any other reasons why you
20   think you're better qualified than Kathryn Lowe for the
21   position that was given to her?
22      A.  I think I've stated.
23      Q.  Okay.  Now, after Kathryn Lowe was given the
24   position, did you ever go to Michael Moore or Paul
25   Johnson and say, Hey, listen, I know I didn't get it,

Page 245

62 (Pages 242 - 245)

**Page 246**

1 but I really want to be considered for the felony
2 position?
3    A. I believe in Michael's response he said
4 continue to pursue future opportunities or look for
5 other opportunities that may -- something about this
6 wasn't the position, but if there are other
7 opportunities, something about that.
8    Q. So let's move on to the Civil Attorney II
9 position. That's going back to your Interrogatory No.
10 3, Exhibit 24. Are you with me?
11    A. Yes.
12    Q. Okay. So I think we've covered -- the first
13 one says Kim Laseter resigned, opening, and Kathryn Lowe
14 was given.
15      Is there anything else you need to add to
16 this Kathryn Lowe promotion that we've not already
17 talked about?
18    A. No.
19    Q. Okay. And then you list the January 2016 where
20 Paul offers you the Juvenile II position, right? We've
21 already covered that?
22    A. Yes, we did.
23    Q. And you declined?
24    A. I did.
25    Q. I guess I'm kind of scratching my head as why

**Page 247**

1 are you listing that as something that you were failed
2 to be given? That's not really supposed to be in there,
3 is it?
4    A. No. I -- there's a reason behind not wanting to
5 pursue that opportunity. And I believe that my -- my
6 reason played out with the eventual termination of that
7 individual. I didn't want to go work in an environment
8 where he didn't seem invested.
9    Q. Who -- who is the individual?
10    A. The -- the then supervisor --
11    Q. Okay. Who was that?
12    A. -- for juvenile. Charlie.
13    Q. Charlie who?
14    A. I have it listed. Charlie Martin.
15    Q. Okay. So you did -- you turned the position
16 down because you didn't want to go to work with Charlie
17 Martin?
18    A. I --
19    Q. What was -- what was his position?
20    A. I interviewed for -- with him and Allison that
21 day, and he just presented as someone that wasn't
22 invested, was somewhat possibly lazy, and maybe -- it
23 just didn't seem like he cared much about what he did.
24    Q. There were other people in that juvenile unit,
25 right?

**Page 248**

1    A. But he would have been the -- he would have
2 been what Sherry is to me, like --
3    Q. Okay. So you didn't want to work with Charlie
4 because you didn't feel like he was invested in the
5 position, and he was ultimately terminated. That's why
6 you turned that position down -- that promotion down?
7    A. Yes.
8    Q. All right. But you -- regardless of your
9 feelings about him, you still would have had a salary
10 increase had you taken that job --
11    A. But I --
12    Q. -- correct?
13    A. I would have been working in an environment
14 where the supervisor was not invested, presented as lazy
15 or unorganized, or not -- his heart wasn't in the
16 position, and he was just a fly-by-night show up and get
17 whatever he could done, done, but I didn't -- he just
18 didn't present well in the interview.
19    Q. Okay. So --
20    A. And I had already --
21    Q. -- you said, I don't want this job. Had you
22 been there, you could have maybe gotten his job, though,
23 right? You could have been the chief of the juvenile
24 unit?
25    A. But I had already been through other difficult

**Page 249**

1 work environments. I wasn't willing to subject myself
2 to a position that I couldn't get out of.
3    Q. Okay. So are you -- so I'm sure there's a lot
4 of difficult work environments in any -- in any company,
5 right?
6    A. Yes.
7    Q. Right. And I imagine then work -- you know,
8 working in the felony division of the Denton County
9 District Attorney's Office is not going to be a walk in
10 the park every day, is it?
11    A. No, it's not.
12    Q. So, I mean, I guess I'm scratching my head. So
13 do you just get to pick and choose as to, you know, I
14 don't want to work with this person. Is this going to
15 be too hard on me? Is that what I'm hearing you say?
16      MR. RAESZ: Object to the form.
17    Q. (BY MR. JOHNSON) It's just too much?
18    A. No. No, sir.
19    Q. All right. But that -- there was nothing
20 discriminatory about them giving you that opportunity,
21 is there?
22    A. No. But it did kind of box me in, considering
23 that no one else in the office wanted to pursue. It
24 didn't seem like other in-house attorneys were pursuing
25 that, because it seems to be a dead end.

Page 258

```
 1    Q. How much research and writing have you done
 2  with the county?
 3    A. We've had -- I've had very few.
 4    Q. Very few what?
 5    A. Like research -- research is different, because
 6  I have to get on and find case law as to whether or not
 7  I can argue against or suppress evidence or whatever
 8  that -- whatever the issue is at that, so research is
 9  different.
10    Q. Uh-huh.
11    A. But the writing opportunity has been limited.
12  And even in CPS, we do daily writing, but more so it's
13  very formulaic for us and making sure that --
14    Q. And you're not able to state whether or not you
15  have more research and writing experience than Linda
16  Puckett, are you?
17    A. I am not.
18    Q. Okay.  Let's move on.  So another spot that
19  you're claiming -- going back to your Interrogatory No.
20  3, Exhibit 24, is a Felony II spot announced by email
21  from Jamie Beck, November 29, 2016.  And this is the
22  spot that Rachel Nichols Sears ultimately received,
23  correct?
24    A. Yes.
25    Q. Okay.  And that's one of the spots you're
```

Page 259

```
 1  complaining about in this lawsuit, right?
 2    A. (Witness nods.)
 3       (Exhibit 31 marked.)
 4    Q. (BY MR. JOHNSON)  Let me show you deposition
 5  Exhibit No. 31.  So this is an email from Jamie Beck to
 6  the district attorneys, November 2016, that -- notifying
 7  everyone that this Felony II spot became available
 8  because Lauren Marshall had decided to work part-time,
 9  correct?
10    A. Yes.
11    Q. And you responded "good morning," and expressed
12  interest in that --
13    A. Yes.
14    Q. -- position; is that correct?
15    A. Yes.
16    Q. Okay.  And what happened next?  Were you -- did
17  you interview?
18    A. There was no interview.
19    Q. Okay.  Do you know who all was considered for
20  that position?
21    A. I do not.
22    Q. Do you know what Denton's reasons were for
23  making that promotion decision?
24    A. I do not.
25    Q. Do you think you're better qualified than
```

Page 260

```
 1  Rachel Sears for that position?
 2    A. I do.
 3    Q. Why?
 4    A. Because I have had misdemeanor trial
 5  experience, as well as the district court experience
 6  while working in CPS.  So I've been in front of a
 7  district judge, as well as the county judges.  I've had
 8  my share of terminations and --
 9    Q. Hold on, let's stop.  So your -- you believe
10  you're more quali -- because you have trial
11  experience --
12    A. Yes.
13    Q. -- right?
14    A. And I've had my share --
15    Q. Well, hold on.  Rachel had trial experience,
16  too, right?
17       MR. RAESZ:  Would you let her finish her
18  answer, please.
19       MR. JOHNSON:  Okay.  Well, I want to --
20  you're -- you're kind of confusing your answer, so I
21  want to just --
22       MR. RAESZ:  No, you're confusing --
23       MR. JOHNSON:  -- take it one at a time.
24       MR. RAESZ:  -- her answer.  Let her finish.
25    Q. (BY MR. JOHNSON)  Can we just go one point at a
```

Page 261

```
 1  time, please.
 2    A. Okay.  Where would you --
 3    Q. All right.  Why are you better qualified than
 4  Rachel Sears for this position, and your first point is,
 5  I've had trial experience.
 6    A. I've had years of -- I had the criminal
 7  misdemeanor trial experience and had successful
 8  convictions while doing that.  I -- in between all that
 9  time, I was being shuffled between whatever -- whatever
10  else was going on in the office at that time with the
11  Cary Piel situation, but, in light of that, I moved to
12  the CPS division and worked well with my then supervisor
13  and had successful terminations and decisions made in my
14  cases where we represented our client well.
15    Q. What other reasons are you more qualified than
16  Rachel Sears?
17    A. I'm an experienced trial attorney who's
18  invested her time and effort and dedication to the
19  office.  My trials have been successful.  While not
20  100 -- I do not have a 100 percent conviction rate, no,
21  I do not, but I did have successful convictions and
22  successful terminations.  I've mediated and dealt with
23  other civil matters that some of the other members of my
24  division hadn't dealt with, like doing depositions and
25  whatever.  So whenever presented with an opportunity to
```

66 (Pages 258 - 261)

1 learn and grow and do something that even some of my
2 peers weren't familiar with, I've jumped in and done a
3 job well.
4    Q. Any others?
5    A. That's the overarching --
6    Q. I'm --
7    A. -- position.
8    Q. -- sorry?
9    A. That is my position.
10   Q. Have you ever tried a case with Rachel Sears?
11   A. Did we do anything in the CPS during her --
12 while she was -- no, not while she was in CPS. And not
13 -- when she was in misdemeanor, I was in CPS, so we were
14 on separate -- separate ends of the office at that time.
15   Q. So is your answer no?
16   A. No.
17   Q. All right. So you're not really qualified to
18 testify as to your courtroom skills versus her courtroom
19 skills, are you?
20   A. I cannot.
21   Q. Do you -- how many cases did you try? How many
22 jury trials did you try at CPS?
23       MR. RAESZ: Object to the form.
24   A. I don't know the number.
25   Q. (BY MR. JOHNSON) More than six?

Page 262

1 division chief at that time -- at this current time, and
2 pursued other opportunities and con -- I continue to
3 pursue other opportunities.
4    Q. All right. So -- well, that's -- that's a very
5 generalized argument.
6       MR. RAESZ: Object to form.
7    Q. (BY MR. JOHNSON) The -- we've already covered
8 all of the emails that you're aware of that you've sent
9 to Denton County saying I'm interested in a position,
10 correct?
11   A. Yes.
12   Q. All right. You're not aware of one other one,
13 right?
14       And I want to go back to Lauren Marshall.
15 Lauren Marshall was a felony prosecutor, right?
16   A. Yes.
17   Q. She was successful?
18   A. I do not know that.
19   Q. All right. You're not in a position to say --
20 well, how long had she been there?
21   A. She started in the office when the Cary Piel
22 situation was going on, because she was the prosecutor
23 that they --
24   Q. My -- my question is how long had she been
25 there?

Page 264

1    A. I don't know the number.
2    Q. You mentioned something about 100 percent
3 conviction rate. Is that something Rachel had or
4 something? I don't know why --
5    A. No, I'm just saying that I -- I know that I did
6 not have a 100 percent conviction rate, but --
7    Q. Okay. All right. Now, those are all the
8 reasons that you can give as to why you believe you're
9 better qualified than Rachel Sears for that Felony II
10 position?
11   A. Yes.
12   Q. All right. Let's move on. The next position
13 that I have that you claim you should have been given
14 was -- I'm really having a hard time with this one.
15 This is when Lauren Marshall gets moved back to Felony
16 II. Right?
17       Are you claiming that moving Lauren
18 Marshall back to felony somehow is discrimination or
19 retaliation against you?
20   A. It was just another example of an opportunity
21 not available in that office for a Felony II position.
22 It's another example of the door being shut in my face.
23 No explanation. Just that I will not be advancing,
24 despite the email that says look for other
25 opportunities. And I followed that advice of the felony

Page 263

1    A. I don't -- whenever that started, when --
2    Q. Would you please answer my questions, please.
3 It's getting late, and I don't mean to talk over you,
4 but if I ask how long has someone been there, that
5 usually requires an answer of so many years or I don't
6 know.
7    A. Less than me.
8    Q. Okay.
9    A. Because I was in the office when she started.
10   Q. All right. She was a felony prosecutor before
11 she moved to intake, correct?
12   A. She was.
13   Q. And you don't know how many years she had been
14 a felony prosecutor, correct?
15   A. I -- no, I didn't track her.
16   Q. And you don't know whether or not she was
17 successful or not as a felony prosecutor?
18   A. I do not.
19   Q. Okay. But she had been there for years, right?
20   A. Yes, she had.
21   Q. And she hadn't been fired, right?
22   A. She had not.
23   Q. So it's pretty reasonable to assume she was
24 doing a good job?
25       MR. RAESZ: Object to the form.

Page 265

67 (Pages 262 - 265)

1 Q. (BY MR. JOHNSON) Right?
2 A. I can't make that assumption.
3 Q. Okay. Then she moves to -- to intake
4 temporarily?
5 A. Yes.
6 Q. Because of family reasons. She was having a
7 baby or something, right?
8 A. It was -- well, that -- I don't want to
9 misspeak for her reason, so --
10 Q. Okay. She -- for personal reasons, she moved
11 to intake?
12 A. Okay.
13 Q. And then she decided, My personal reasons are
14 over, I want to move back to felony.
15 A. Okay.
16 Q. -- right?
17 And you're complaining that somehow giving
18 her her old job back is discrimination against you. Is
19 that what you're telling this jury?
20 A. Well, was her -- was it ever provided that she
21 was going to flip-flop? That information wasn't
22 provided, like, oh, is this temporary. All I knew is
23 that a position became available, I wasn't going to be
24 placed in that position. I -- I don't know what her
25 plan was, whether or not her plan was only to be in
Page 266

1 intake temporarily, and once I get back on my feet or
2 once my family situation calms down or whatever that
3 situation that you explained was, I don't know of any
4 arrangement she made with the office to only let her
5 temporarily be in intake and then we'll open the door
6 for you again when you get that -- that situation
7 quieted down and --
8 Q. I'm sorry.
9 A. -- you can come back.
10 Q. Okay. You finished. I'm sorry. You finished.
11 Okay. I'm sorry.
12 Was Jamie supposed to come to you and say,
13 Hey, Nadiya, I just want to let you know that we've
14 moved Lauren over here temporarily. Are you cool with
15 that? Is -- is that what you're telling this jury?
16 Somehow they're supposed to tell you what they're doing?
17 A. What I'm --
18 MR. RAESZ: Objection, form.
19 A. What I was saying is that I wasn't aware that
20 it was only temporary. All I saw was that there was an
21 opportunity.
22 Q. (BY MR. JOHNSON) All right. That's your only
23 evidence?
24 A. Is that there was an opportunity.
25 Q. All right. Are you claiming that you, Nadiya
Page 267

1 Boldware, who's never been in felony before in your
2 life, is more qualified than Lauren Marshall --
3 A. I'm not --
4 Q. -- as a felony prosecutor?
5 A. I am claiming that I had --
6 Q. No, that's my question. Yes or no, are you
7 claiming in this case that you are more qualified than
8 Lauren Marshall?
9 A. I'm claiming that I am capable of filling a
10 Felony II position.
11 MR. JOHNSON: Okay. Objection,
12 nonresponsive.
13 Q. (BY MR. JOHNSON) You know, you remember at the
14 trial the judge admonishing you for failing to answer
15 questions responsively, right?
16 A. Yes, I do.
17 Q. Okay. You're doing that right now --
18 A. I understand.
19 Q. -- aren't you? Okay.
20 And do you think that that somehow makes
21 you look better?
22 A. No, I'm --
23 MR. RAESZ: Object to form.
24 Q. (BY MR. JOHNSON) It makes you look worse. Do
25 you --
Page 268

1 MR. RAESZ: Object to the form.
2 Q. (BY MR. JOHNSON) -- understand that?
3 A. I'm -- I'm --
4 Q. It's late in the day, we've been here for
5 hours --
6 A. Okay.
7 Q. -- right?
8 Do you think the jury is going to want you
9 to not answer my questions?
10 MR. RAESZ: Object to form.
11 A. I don't know what --
12 Q. (BY MR. JOHNSON) Do you think you're more
13 qualified than Lauren Marshall for the position that she
14 was returned to in September of 27 --
15 A. I'm believe I'm --
16 Q. -- 2017, yes or no?
17 A. I believe I'm qualified.
18 Q. You -- so then you don't believe you're more
19 qualified than her, do you?
20 A. I don't know her experience in the office.
21 Q. So you don't believe you were more qualified
22 than her, do you?
23 MR. RAESZ: Object to the form.
24 Q. (BY MR. JOHNSON) Yes or no?
25 A. I believe I'm qualified.
Page 269

68 (Pages 266 - 269)

Page 270:

```
 1    Q.  Okay.  I'm going to ask you again, one more
 2  time.  You do not believe -- you do not know whether you
 3  are more qualified or not than Lauren Marshall, do you?
 4    A.  I believe I'm qualified.
 5    Q.  Okay.  But not more qualified, correct?
 6    A.  I believe I'm qualified.
 7    Q.  Okay.  So you're not going to answer my
 8  question.
 9        What other positions do you contend you
10  should have been promoted into in this case, other than
11  those that we've just covered?
12        MR. RAESZ:  Object to the form.
13    A.  I am --
14    Q.  (BY MR. JOHNSON)  I mean, there are none other
15  in your Interrogatory No. 3, are there?
16    A.  Not in that interrogatory.
17    Q.  I'm still waiting on an answer.
18    A.  I believe I answered you.
19    Q.  No.  What other positions do you contend you
20  should have been promoted into in this case, other than
21  those that we've just covered?
22    A.  We've covered the positions, and anything else
23  is noted in my documents.
24    Q.  What -- what documents then?  Since you keep
25  using that as a hedge.  What documents are you --
```

Page 271:

```
 1        MR. RAESZ:  Object to the form.
 2    Q.  (BY MR. JOHNSON)  -- discussing?  Identify them
 3  specifically, please.
 4    A.  In this office, I've not been considered for a
 5  misdemeanor chief position, I've not been considered
 6  for -- or if I was considered, I wasn't informed as to
 7  why I would not be a misdemeanor chief.  I wasn't
 8  informed why I wouldn't be a felony prosecutor.  I just
 9  know that the process of declining and passing over
10  continued.  I don't know the reason why.  I know that
11  even from the felony prosecutor division chief, he
12  encouraged that I pursue other opportunities and I -- I
13  continued to pursue other opportunities, and all those
14  opportunities led to dead ends.
15    Q.  All right.  I need to know what opportunities
16  you specifically sought out that we haven't already
17  talked about.
18    A.  I believe we've talked about them.
19    Q.  Okay.  So you're -- this is just some general
20  claim you're making that somehow they should consider me
21  for this job, right?
22        MR. RAESZ:  Object to the form.
23    A.  It's not a general claim.  I've been specific
24  in what I've wanted to be considered in and things that
25  I've pursued.
```

Page 272:

```
 1    Q.  (BY MR. JOHNSON)  Okay.  All right.  And I
 2  think we've already covered that you've never applied
 3  for -- specifically sought out a misdemeanor chief
 4  position, correct?
 5    A.  No.
 6    Q.  All right.  So let's talk about for all these
 7  other jobs that you didn't specifically apply for that
 8  you somehow are claiming that you should have been
 9  promoted into.
10        MR. RAESZ:  Object to the form.
11    Q.  (BY MR. JOHNSON)  First of all, there are --
12  there are approximately 60-plus lawyers in the Denton
13  County misdemeanor -- sorry -- the Denton County
14  District Attorney's Office, correct?
15    A.  That's correct.
16    Q.  Sixty-plus.  All right.
17        And you don't know who made the decision to
18  select the persons that were promoted into these
19  positions that you did not seek, correct?
20    A.  I do not.
21    Q.  And you do not know who all was considered for
22  those positions, do you?
23    A.  I do not.
24    Q.  And you don't even know if you were even on the
25  radar, do you?
```

Page 273:

```
 1    A.  I do not.
 2    Q.  Okay.  And you certainly don't know Denton's
 3  reasons for making the promotion decision that you
 4  didn't seek, correct?
 5        MR. RAESZ:  Object to the form.
 6    A.  I'm sorry?
 7    Q.  (BY MR. JOHNSON)  You certainly don't know
 8  Denton's -- you certainly don't know Denton's reasons
 9  for making the promotion decision that you didn't seek,
10  correct?
11        MR. RAESZ:  Object to the form.
12    A.  The reason that I've list -- or would -- I
13  would state as a reason is retaliation for a reason as
14  -- as to why not to promote me, because I pursued the
15  legal action before, and as a form of punishment or
16  shutting the door, these opportunities will not be open
17  to you.
18    Q.  (BY MR. JOHNSON)  What proof do you have that
19  that's, in fact, the case?  What -- what has anybody
20  said or done specifically to support that conclusion?
21    A.  The done is to deny the opportunity.
22    Q.  The -- the three or four that we've identified,
23  correct?
24    A.  The ones that have been identified.
25    Q.  All right.  That wasn't my question.
```

1    My question was, for the opportunities that
2 you didn't seek that you seem to be complaining about in
3 this lawsuit, you have no idea what Denton's reasons
4 were for -- for promoting whoever was promoted, correct?
5        MR. RAESZ:  Object to form.
6    A. I do not know.
7    Q. (BY MR. JOHNSON)  Do you know the procedure --
8 regarding the misdemeanor chief position, do you know
9 where the person selected come from?
10    A. From the trial division.
11    Q. From the misdemeanor position?
12    A. Mis --
13    Q. From the misdemeanor.  So in order to go up,
14 normally it's you're a I or a II, and then you go up to
15 chief.  Those people are already in the misdemeanor --
16    A. Trial division.
17    Q. -- right?
18    A. Yes.
19    Q. You left the misdemeanor trial division in '10?
20    A. Yes.
21    Q. All right.  So if you're not in the position
22 since '10, and they promote from within that division,
23 how could you be considered for that chief position?
24    A. I could speak to Kristin and explore whether or
25 not if I -- if being a chief were an option in currently

Page 274

1 my intake position.  I just know that any area of
2 promotion regarding moving out of my intake chair has
3 been limited, and I do not know that being in intake
4 either limits or opens the door to -- for me either way.
5 I don't know what their policy is on that.
6    Q. All right.  You keep overlooking the fact that
7 they gave you a felony position opportunity all the way
8 back in '12, right?
9    A. I'm not over --
10        MR. RAESZ:  Object to form.
11    A. I'm not overlooking that.
12    Q. (BY MR. JOHNSON)  You said no, I don't want it?
13    A. I didn't -- I don't know that that's what was
14 said.
15    Q. Okay.  Well, you're not in it?
16    A. But those words that you shared --
17    Q. All right.  So -- but going back to the
18 misdemeanor chief.  The procedure is for someone who's
19 in that division to get promoted, correct?
20    A. Yes.
21    Q. And you haven't been in that position since
22 2010.  You haven't been in that division since 2010,
23 correct?
24    A. I -- I don't --
25        MR. RAESZ:  Object to form.

Page 275

1    A. I don't know if you want to call my position a
2 hybrid position.  I'm considered a misdemeanor
3 prosecutor.  The fact that I don't rotate from court to
4 court, if that prevents me from being a chief, then
5 that's not something I'm aware of.
6    Q. (BY MR. JOHNSON)  Okay.  You're in intake right
7 now?
8    A. Yes.
9    Q. And you're not trying cases?
10    A. I am not.
11    Q. Okay.  So I believe you testified earlier that
12 your best recollection is you've applied with Collin
13 County two times to work there?
14    A. Recently, yes, unless --
15    Q. I didn't ask you recently.  I said how many
16 times have you applied to Collin County?
17        MR. RAESZ:  Objection to form.
18    A. I --
19    Q. (BY MR. JOHNSON)  And you said twice, as I
20 recall.
21    A. The most recent applications have been twice.
22 Anytime before would have been a long time ago.
23    Q. All right.  We'll let the record stand on its
24 own.
25        MR. RAESZ:  Object to form.

Page 276

1        (Exhibit 32 marked.)
2    Q. (BY MR. JOHNSON)  Let me show you Exhibit 32.
3 Is this a true and correct copy of an online application
4 that you submitted to Collin County in -- on or about
5 August of 2009?
6    A. I believe so.
7    Q. Okay.  And you were seeking a misdemeanor
8 prosecutor position?
9    A. Yes.
10        (Exhibit 33 marked.)
11    Q. (BY MR. JOHNSON)  Let me show you Exhibit 33.
12 And is this a true and correct copy of a -- of a job
13 application you submitted to Collin County District
14 Attorney's Office on October 3rd of 2011?
15    Q. And you were seeking a misdemeanor prosecutor
16
17 position?
18    A. Yes.
19        (Exhibit 34 marked.)
20    Q. (BY MR. JOHNSON)  Let me show you Exhibit 34.
21 Another -- another job application to Collin County
22 District Attorney's Office, correct?
23    A. Yes.
24    Q. And you were seeking a misdemeanor prosecutor
25 position?  That's January 25th of 2016?

Page 277

70 (Pages 274 - 277)

1 we're talking about in this case. I know you think you
2 want to retry that case, and I --
3     A. I'm not --
4     Q. -- again, I just get back to the --
5     A. I don't --
6         MR. RAESZ: Object to the form.
7     Q. (BY MR. JOHNSON) If anybody's retaliating,
8 it's you are trying to retaliate against the -- Denton,
9 because you can't get over it.
10        MR. RAESZ: Object to the form.
11    Q. (BY MR. JOHNSON) Can you? You can't get over
12 this --
13    A. I'm not --
14    Q. -- that case, can you?
15    A. -- retaliating.
16        MR. RAESZ: Object to the form.
17        Counsel, if you're going to sit here and
18 argue with her, we're going to shut this down. Why
19 don't you ask a question.
20    Q. (BY MR. JOHNSON) What other pain and suffering
21 have you suffered from?
22    A. Embarrassment.
23    Q. Stress.
24    A. Stress.
25    Q. What else?

Page 294

1     A. The --
2         MR. RAESZ: She's already testified to
3 frustration, anger, disappointment and --
4         MR. JOHNSON: Well, there's -- there's not
5 anything in the record on that, because it wasn't
6 responsive. And you can't -- and object and decide --
7 what, are you going to coach her?
8         MR. RAESZ: No. I'm just saying that we --
9         MR. JOHNSON: Why don't you -- do you want
10 to take a few minutes to go talk to her a little bit
11 about it, see if you can enhance her testimony, Chris?
12        MR. RAESZ: No. Actually, I want you to
13 quit asking the same question over and over and over.
14 That's what --
15    Q. (BY MR. JOHNSON) I'm entitled -- yeah, I'm
16 entitled to a full answer.
17        Describe all pain and suffering you contend
18 you --
19        MR. RAESZ: You're entitled to that.
20    Q. (BY MR. JOHNSON) -- have suffered from as a
21 result of the promotions that you claim -- you're
22 complaining about in this lawsuit.
23        We've got embarrassment and stress, in the
24 only thing that you've answered that's responsive. And
25    A. If you want to ask me if I've been angry that I

Page 295

1 was denied the opportunity, yes.
2     Q. Okay. Angry. Anger. All right. What else?
3     A. If you want to know that I've had sleepless
4 nights about this, yes.
5     Q. Okay.
6     A. If you want to know that I sat in my bed on New
7 Year's Eve as -- knowing that Rachel was going to be
8 announced as the new felony prosecutor, yes, I remember
9 ending that year knowing that here we go again. Once
10 again, here we go again. Because I'd already watched it
11 in many of the other promotions before that one, but I
12 sat in my bed that year and cried.
13    Q. Okay.
14    A. Knowing that it was going to happen, but
15 waiting for the opportunity that I could then speak up
16 or do something about it. Because it had happened prior
17 to that, it had -- and I -- I knew it when I saw -- when
18 I saw the pattern and knew that we had a -- a nearly
19 patterned progress in the office, a nearly patterned
20 experience, that I -- I couldn't distinguish us from --
21 like she's been in criminal, she's been in CPS. I was
22 in criminal, I've been in CPS. And I was in criminal.
23        I couldn't distinguish the two, but when I
24 saw it happen, I was -- I was -- I knew that everything
25 else that had transpired before was leading to that

Page 296

1 moment so I could see it in -- in my face, so I could
2 know in my face that this was going to continue unless I
3 stood up to do something.
4     Q. Okay. Have you -- have you described all the
5 pain and suffering that you claim you have suffered as a
6 result of the promotions that you're complaining about
7 in this case?
8     A. There was also financial burdens that I mean --
9     Q. What financial burdens?
10    A. Well, I took a pay cut, but I was never able to
11 make it back up to what I initially -- I was making when
12 I was in CPS. I slowly started to receive the -- the -- the
13 the payment adjustments that we -- we get from the
14 county, but I don't think I ever made it back up to what
15 I took when I left the division.
16    Q. So you could have taken that felony promotion
17 or the juvi promotion in January of '16, would have
18 given you a pay increase, right? Right.
19    A. And I could have worked for Charlie and have --
20 and Allison and been in a very --
21    Q. I mean, if Charlie is incompetent, he wasn't
22 abusive. I mean, I don't get it.
23    A. No, but I didn't want to work with someone that
24 it was -- it was a -- a dead-end opportunity. One, it
25 was taking me also off of the felony track. There were

Page 297

Page 298

1  no other -- people inside the office, no one else -- no
2  one else seemed to be pursuing the -- the juvi position
3  from inside the office.  They were outside hires.
4        Q.  There are a number of people who have gone from
5  juvi to felony.
6        A.  That's correct.
7        Q.  All right.  So the -- the fact that you're like
8  it's a -- it's a dead-end street, that's not true, is
9  it?  In fact, you would have been trying felony --
10  you've already testified you would have been trying
11  felony cases in that juvi position --
12            MR. RAESZ:  Object to form.
13        Q.  (BY MR. JOHNSON)  -- correct?
14        A.  Which would mean that they -- they believe that
15  I have the ability to try a felony.
16        Q.  (BY MR. JOHNSON)  That's not the point.  That's
17  not the point.
18        A.  If they were going to put me in a court where I
19  would be trying felonies, that would -- I would believe
20  that that's a statement that they believed I was
21  capable.
22        Q.  That's fine.  But, I mean, didn't we already
23  establish that it's Denton's responsibility to put the
24  most qualified person on the job?
25            MR. RAESZ:  Object to form.

Page 299

1        Q.  (BY MR. JOHNSON)  And not just because of their
2  skin color or because they're upset because they can't
3  get over a lawsuit that they lost?
4        A.  The law -- the lawsuit happened surrounding a
5  person of color, where someone made a comment to a
6  person of color as their -- as their audience.
7        Q.  Yeah, we get -- we get all that.  I think that
8  seems to be a reoccurring theme.
9            All right.  Let's --
10            MR. RAESZ:  Object to the form.
11        Q.  (BY MR. JOHNSON)  I want to talk about -- your
12  damages are -- you can -- the way your damages are
13  calculated is by comparing your salary history to Paul
14  Hiemke's salary history; is that correct?
15        A.  That -- for the -- basically, yes.  That's one
16  of the --
17        Q.  Well, there's no one else identify -- well,
18  let's get your expert report out.  Make sure we're
19  100 percent clear here.  All right.  Let me show you
20  Plaintiff's -- oh, wrong one.  Hold on.  Sorry, it's
21  getting late.
22            (Exhibit 37 marked.)
23        Q.  (BY MR. JOHNSON)  Is that a true and correct
24  copy of your expert disclosures in this case?
25        A.  Yes, sir.

Page 300

1        Q.  All right.
2        A.  Did you -- is this my -- there was handwriting
3  on one of the pages, so I didn't know.
4        Q.  Yeah.
5            MR. JOHNSON:  All right.  Let's do this.
6  Let me have that back.  Let's do this.  I'm going to
7  take out page -- okay.  I need page 6.  Can I get --
8  let's go off the record for a minute.
9            THE VIDEOGRAPHER:  Off the record at 5:40.
10            (Break taken from 5:40 p.m. to 5:46 p.m.)
11            THE VIDEOGRAPHER:  We're back on the record
12  at 5:46.
13        Q.  (BY MR. JOHNSON)  Ms. Boldware, we were
14  reviewing Plaintiff's expert disclosure, Exhibit 37.  Is
15  this a true and correct copy of your expert disclosure
16  of this lawsuit?
17        A.  Yes, sir.
18        Q.  And it lists Dale Bossio as your economist; is
19  that correct?
20        A.  That's correct.
21        Q.  And that's the only expert you've identified in
22  this lawsuit?
23        A.  Yes, sir.
24        Q.  And so, if you would turn to page 3 of 7,
25  please, where it says lost back pay and lost front pay,

Page 301

1  do you see that section?
2        A.  I'm sorry, some of these are out of order.
3        Q.  Well, they shouldn't be out of order.  Excuse
4  me for reaching, but I'm going to try to get you there
5  so we can move on here.  All right.  It's page 3 of 7 of
6  this report.
7        A.  Okay.
8        Q.  Are you with me?
9        A.  Yes.
10        Q.  All right.  And so in the first paragraph under
11  roman numeral IV, it says -- that line -- from -- the
12  fourth line from the bottom, it says, "She contends that
13  she is as qualified to attain a felony prosecutor
14  position as Mr. Hiemke, correct?
15        A.  Yes.
16        Q.  "And similarly qualified with respect to other
17  attorneys who have been promoted into a felony
18  prosecutor position."
19            Did I see that -- read that correctly?
20        A.  Yes.
21        Q.  Okay.  And that's your contention in this
22  lawsuit, correct?
23        A.  Yes, sir.
24        Q.  And then it says you requested that I use Mr.
25  Hiemke's pay rate as the rate Ms. Boldware would have

Nadiya Williams-Boldware - June 19, 2018

Job No. 2915194

| 1 | CHANGES AND SIGNATURE |
|---|---|
| 2 | WITNESS NAME: NADIYA WILLIAMS-BOLDWARE      DATE: 6/19/18 |
| 3 | PAGE LINE        CHANGE            REASON |
| 4 | 6    11         RENEE → BRUNA      TYPO |
| 5 | 13    6         SHERMAN → GREENVILLE   WRONG TOWN |
| 6 | 28   13         DEALY → DAILY       TYPO |
| 7 | 45   13         GOLD → GOAL         TYPO |
| 8 | 47   21         THAT → THE          TYPO |
| 9 | 62   11         CHILD → TRIAL       TYPO |
| 10 | 63   23        AT → FOR            TYPO |
| 11 | 69    7        IT → I              TYPO |
| 12 | 88    5        CLIENT → CLIMATE    TYPO |
| 13 | 113  10        WHICH → WHEN        TYPO |
| 14 | 121  24        WOULDN'T → WOULD    TYPO |
| 15 | 173   1        CHANGED → CHANGES   TYPO |
| 16 | 178   8        THAT → THE          TYPO |
| 17 | 250   1        ANYBODY → ANY ONE   TYPO |
| 18 | 250   4        OUR → OFFICE        TYPO |
| 19 | 281   3        IS → IF             TYPO |

Page 315

Veritext Legal Solutions
800-336-4000

Nadiya Williams-Boldware - June 19, 2018

Job No. 2915194

1      I, NADIYA WILLIAMS-BOLDWARE, have read the

foregoing deposition and hereby affix my signature that

2   same is true and correct, except as noted above.

3

4                    *Nadiya Boldware*

5            NADIYA WILLIAMS-BOLDWARE

6

7   State of Texas

8   County of Denton

9

10  This instrument was

11  acknowledged before me on this the

12  3rd day of August, 2018 by

13  Nadiya Williams- Boldware

14

15  Personally Known as identification

16

17              *Shirley T. Musgrave*

18          Shirley T. Musgrave

19          Notary Public, State

20                  of Texas

21

22

23      SHIRLEY T. MUSGRAVE
24   Notary Public, State of Texas
     Comm. Expires 01-22-2021
25      Notary ID 129275640

                          Page 316

Veritext Legal Solutions
800-336-4000

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
 2                     SHERMAN DIVISION
 3    NADIYA WILLIAMS-BOLDWARE,      )
                                     )
 4                 Plaintiff,        )
                                     ) CIVIL ACTION
 5    VS.                            )
                                     ) NO.:
 6                                   ) 4:17-CV-00859-ALM-KPJ
      DENTON COUNTY, TEXAS,          )
 7                                   )
                   Defendant.        )
 8
 9                 REPORTER'S CERTIFICATION
10          DEPOSITION OF NADIYA WILLIAMS-BOLDWARE
11                     JUNE 19, 2018
12         I, Claudia White, Certified Shorthand Reporter in
13    and for the State of Texas, hereby certify to the
14    following:
15         That the witness, NADIYA WILLIAMS-BOLDWARE, was
16    duly sworn by the officer and that the transcript of the
17    oral deposition is a true record of the testimony given
18    by the witness;
19         I further certify that pursuant to Federal Rules of
20    Civil Procedure, Rule 30(e)(1)(A) and (B) as well as
21    Rule 30 (e)(2) that the signature of the deponent:
22         _X_ was requested by the deponent and/or a party
23    before completion of the deposition and is to be
24    returned within 30 days from date of receipt of the
25    transcript.  If returned, the attached Changes and
```

Page 317

```
 1   Corrections and Signature pages contain any changes and
 2   the reasons therefor;
 3        ____ was not requested by the deponent and/or a
 4   party before the completion of the deposition.
 5        That $_____ is the deposition officer's charges
 6   for preparing the original deposition transcript and any
 7   copies of exhibits, charged to DEFENDANT;
 8        That pursuant to information given to the
 9   deposition officer at the time said testimony was taken,
10   the following includes counsel for all parties of
11   record:
12   FOR THE PLAINTIFF:
13        Mr. Chris Raesz, Esq.
          CHRIS RAESZ, P.C.
14        306 North Carroll Boulevard
          Denton, Texas 76201
15        (940) 380-9505
          chrisraeszpc.com
16
     FOR THE DEFENDANT:
17
          Mr. Hunter Johnson, Esq.
18        CONSTANGY, BROOKS, SMITH & PROPHETE, LLP
          1201 Elm Street
19        Suite 2550
          Dallas, Texas 75270
20        (214) 646-8625
          hjohnson@constangy.com
21
22        I further certify that I am neither counsel for,
23   related to, nor employed by any of the parties or
24   attorneys in the action in which this proceeding was
25   taken, and further that I am not financially or
```

Page 318

1   otherwise interested in the outcome of the action.

2       Certified to by me this 29th day of June, 2018.

3

4

5

6                           Claudia White

                            Texas CSR No. 8242

7                           Expiration Date:  12/31/2018

                            VERITEXT LEGAL SOLUTIONS

8                           Veritext Registration No. 571

                            300 Throckmorton, Suite 1600

9                           Fort Worth, Texas 76102

                            (817)336-3042 (800) 336-4000

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 319

Page 106

1  Office in Denton, Texas.
2    Q.  How long have you been employed there?
3    A.  This past February 28th, it was five years.
4    Q.  Okay.  And you were licensed to practice law in what
5  year?
6    A.  2006.
7    Q.  Okay.  And what law school did you attend?
8    A.  Tulane Law School.
9    Q.  You've had prior jobs before coming to the district
10  attorney's office, correct?
11   A.  Yes, I have.
12   Q.  All right.  But your first job as an attorney, a
13  licensed attorney, that was for the Denton County District
14  Attorney's office, correct?
15   A.  Yes.
16   Q.  Okay.  And could you tell the jury what jobs you've
17  held while employed for the Denton County District
18  Attorney's Office.
19   A.  I was hired as a misdemeanor prosecutor, and while in
20  the Denton DA's office, I've gone from the misdemeanor
21  division and then to the CPS division.  There was a short
22  stint, it's still considered misdemeanor, but I was in the
23  family violence unit.  Still considered misdemeanor, but I
24  have a -- kind of a double supervisor situation at that time
25  as well.

Page 107

1    Q.  So we'll come back to --
2         THE COURT:  Excuse me.  Just for record
3  purposes, would you state for the record what "CPS" means.
4         THE WITNESS:  Child Protective Services.
5         THE COURT:  Go ahead.
6         MR. RAESZ:  Thank you, Judge.
7    Q.  (BY MR. RAESZ)  We'll come back to the supervisor
8  issue.  Right now, I'd like you to give the jury some idea
9  what the normal progression is from a beginning misdemeanor
10  prosecutor to a felony position.
11   A.  You come in as a misdemeanor.  You're a II in the
12  court.  There's three misdemeanor prosecutors assigned to a
13  court, one being a chief that you report to directly and the
14  two others work as the lower echelon attorneys.  We -- there
15  are five county courts and you rotate in between the five
16  misdemeanor county courts.  You can change the court chief
17  that you respond to or you work with, you can change the other
18  second that you work with, because ultimately you're exposed
19  to all of your coworkers and all of the individuals in the
20  misdemeanor section.
21         You -- while you're in misdemeanor, you have
22  some JP responsibilities, meaning Justice of the Peace court
23  responsibilities, dealing with traffic tickets or Class C-type
24  offenses.  There's a special misdemeanor court that's carved
25  out for family violence, and you -- that's normally not the

Page 108

1  court that you re- -- or that you're assigned to right off the
2  bat when you're a newer prosecutor, but eventually, most
3  people matriculate through that court as well for the
4  experience of working with that division.
5    Q.  Okay.  Matriculate, that's sort of a big word.
6  Let's -- what does that mean?
7    A.  It -- you rotate through that court.
8    Q.  After you've gained experience?
9    A.  Usually it's after you've gained some sort of
10  experience in the misdemeanor division.
11   Q.  And then, at some point, do you move from the lower
12  misdemeanor prosecutor to the chief position in misdemeanor
13  court?
14   A.  Yes, sir.  After -- people either have to leave and
15  be transferred up the chain to felony courts or they go out on
16  their own -- do something different.  But there is kind of a
17  seniority-type basis.  You look -- look to see who's been
18  there the longest, and those people rotate through being
19  assigned a chief of a court.
20   Q.  And at some point, it would -- it would require a
21  vacancy for someone to move from misdemeanor to felony,
22  correct?
23   A.  Yes, sir.
24   Q.  All right.  Now, when you took the job initially at
25  the Denton County District Attorney's Office, it -- was it

Page 109

1  your intention to move through that track from the lower
2  misdemeanor up to felony?
3    A.  That was the career path that I had anticipated for
4  myself and that was the direction that I had planned on
5  taking, yes.
6    Q.  All right.  And then the -- at some point -- there's
7  actually some higher positions than the felony prosecutors in
8  the supervisor realm, correct?
9    A.  Yes.
10   Q.  All right.  Did you ever have any intention to go
11  into the supervisor area?
12   A.  I mean, that's definitely a lofty dream, but that --
13  I mean, that's the direction that I -- you head on.  You come
14  into misdemeanor -- at least I did.  You come into
15  misdemeanor.  I wanted the supervisor -- supervisory
16  experience.  I wanted to become a misdemeanor chief.  I wanted
17  to matricu- -- I wanted to progress up the chain of that
18  advancement.
19   Q.  Okay.  And that's -- that's -- for normal, everyday
20  prosecutors, this is how the progression works, correct?
21   A.  Yes, sir.
22   Q.  Okay.  And since this is your only job in the
23  district attorney field, do you have any idea if that's the
24  norm in the industry?
25   A.  I wouldn't be able to speak on how they do it in

28 (Pages 106 to 109)

74789e6e-97bc-4213-8606-5a41ec5c5b57



DEPOSITION
EXHIBIT
3

PENGAD 800-631-6989

EEOC Form 5 (11/09)

| # CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 450-2017-03110 |

| **Texas Workforce Commission Civil Rights Division** | | and EEOC |
|---|---|---|
| *State or local Agency, if any* | | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Ms. Nadiya B. Williams-Boldware | (972) 542-8542 | 1976 |

| Street Address | City, State and ZIP Code |
|---|---|
| 5399 Conestoga, Fairview, TX 75069 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| DENTON COUNTY DISTRICT ATTORNEY'S OFFICE | 101 - 200 | (940) 349-2600 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1450 E. Mckinney Street, Denton, TX 76209 | Ruth   Digitally signed by Ruth Lopez DN: cn=Ruth Lopez, o=Dallas District Office, ou=EEOC, |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | Lopez | email=Ruth.Lopez@eeoc.gov, c=US<br>Date: 2017.07.03 09:30:01 -05'00' |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 01-03-2017  Latest: 01-03-2017

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

**I.  PERSONAL HARM:**

On or about September 2016, I applied for multiple positions for Assistant District Attorney Office. On or about January 3, 2017, I was denied any positions that I applied for.

**II.  RESPONDENT'S REASON FOR ADVERSE ACTION:**
No reason was given.

**III.  DISCRIMINATION STATEMENT:**

I believe that I was discriminated against because of my race (African-American), in violation of Title VII of the Civil Rights Act of 1964, as amended. I believe that I was retaliated against in violation of Section 704(a) of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY -- When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| *Jul 03, 2017*     *[signature]* | *[signature]*<br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |
| Date     Charging Party Signature | *[signature]* |

PENGAD 800-631-6989

**DEPOSITION EXHIBIT 4**

CONFIDENTIAL
DENTON 00187

# INTERVIEW NOTES

CHARGE # 450-2017-03110N

DATE: 6/19/2017

PERSON INTERVIWED: Nadiya B. Williams

MANNER OF INTERVIEW: In Person

LOCATION OF INTERVIEW: Intake

INTERVIEWER: Angel M Padilla

CP began working for Denton County District Attorney's Office in February 28, 2007, as an Assistant District Attorney. PCP's current position is in the intake department.
PCP is alleging being discriminated against based on her race (African-American), and retaliated against. PCP began by saying that she had filed a previous race discrimination charge which she filed in court and won. PCP said that the allegation was a comment made by a felony prosecutor, who said that "he believed that the defendant should have been lynched." PCP said that the decision was overturned at the appellate court, and a writ was filed with the Supreme Court who declined the motion on January 2014. PCP also stated that in March 2013 while giving birth to her child she had an amniotic fluid embolism. PCP said that she lost her memory, and had to learn to walk and talk again. PCP returned to work on March 4, 2013 without any restrictions. PCP said that her supervisor wanted to move her to Child Protective Services, and she asked to stay in her current position. PCP said that she felt the actions by Allison Sartin and Karin Qualls were to make her quit. PCP said that her competence was questioned by the judge in her first trial after returning to work. PCP said that she has applied for at least three positions to become a Felony Chief. PCP said that approving official for those positions is Paul Johnson, who failed to take action on her initial complaint of race discrimination. PCP said that in January 3, 2017, she applied for a Felony Chief position and it was given to Rachael Nichols who has half the seniority she has. PCP said that Nichols carrier positions are identical to hers.  PCP said that her evaluations are all positive, except the one written by Kim Qualls which is average. Qualls gave PCP lower points without any justification. PCP was advised of her right to file, and advised that even if the commission finds caused, it would be up to the Department of Justice to file suit if conciliation failed. PCP decided to talk to an attorney before filing. PCP declined to file.

(b)(5)

Angel M Padilla



CONFIDENTIAL
DENTON 00179